**POPE & TALBOT, INC., a corporation,**
Appellant,

v.

**Jack V. CORDRAY, Appellee.**

No. 15863.

United States Court of Appeals
Ninth Circuit.

Aug. 5, 1958.

Summers, Bucey & Howard, Charles B. Howard, Richard W. Buchanan, Seattle, Wash., for appellant.

Zabel & Poth, Philip J. Poth, Seattle, Wash., for appellee.

Before HEALY, HAMLEY and HAMLIN, Circuit Judges.

HAMLIN, Circuit Judge.

This is an appeal by appellant Pope & Talbot, Inc., (defendant below) from a judgment against appellant in the sum of $28,750 and in favor of Jack V. Cordray, appellee herein and plaintiff below. The judgment was entered after a jury verdict in favor of appellee.

The action was originally commenced in the Superior Court of the State of Washington for King County and was removed to the United States District Court, Western District of Washington, Northern Division, by reason of the diversity of citizenship of the parties and the amount in controversy being in excess of $3,000. Jurisdiction in the District Court is based upon Title 28 U.S. Code, Section 1332 and Section 1441, and jurisdiction in this court is based upon Title 28 U.S.Code, Section 1291.

The facts show that the S.S. P & T Adventurer was owned by appellant and that Cordray was injured while this ship was at a dock in the port of Seattle and was engaged in discharging its cargo. The shipowner had contracts with two stevedoring companies in the cargo operation. The contract with one, the Seattle Stevedore Co., covered the operations pertaining to the discharge of cargo from the ship's hold to the ship's side at Pier 38; and the contract with the other, the Olympic Steamship Co., covered the operations pertaining to the moving of cargo from ship's side to place of rest on the dock. The longshoremen on the ship were employed by the Seattle Stevedore Co. and the longshoremen on the dock were employed by the Olympic Steamship Co. Cordray was an employee of the Olympic Steamship Co. and was a foreman of the dock longshoremen. It was one of Cordray's duties to see that the cargo was moved to its first place of rest from the ship's tackle, and it was his duty also to coordinate the activities of the dock working longshoremen with those of the ship working longshoremen in order to have terminal employees and equipment available at the end of ship's tackle to keep the cargo moving. While most of the work of Cordray was done upon the dock, the evidence showed that Cordray was aboard the vessel at the time of his injury for the purpose of coordinating the cargo handling work of the dock longshoremen with that of the longshoremen working on the ship. The accident happened about a quarter to five in the morning and Cordray went on board to ascertain whether the gang of longshoremen on the ship were going to go home or shift to another hatch, so that Cordray could determine whether or not he would keep his dockside longshoremen available to continue the work.

While Cordray was talking to a foreman for the Seattle Stevedore Co. on board the ship, "the boom was 'wung in' over the edge of the ship and the block on the tent gantline dropped and hit him on the side of the neck and head." Cordray thereby suffered certain personal injuries which will be discussed later. There was evidence in the record which shows that the wire strap securing the block which fell upon Cordray was completely rusted through, and that the sole cause of its falling was the unseaworthy condition of the wire strap suspending it.

Cordray alleged in his amended complaint that the accident occurred by reason of the unseaworthiness of the vessel and the negligence of the appellant. At the close of the evidence, defendant moved for a directed verdict in its favor. After this was denied and a jury verdict was rendered against the defendant, it moved for a new trial and a judgment notwithstanding the verdict,—all of

which were denied by the trial Court. Notice of appeal to this court was thereafter filed by defendant.

Among the issues raised by defendant upon this appeal are (1) that the appellee was not within the class of workers entitled to recover damages from a shipowner upon the ground of unseaworthiness nor on the ground of negligence to an invitee and business guest; and (2) that the Court erred in the following particulars: (a) in instructing the jury on unseaworthiness by its use of the term "cargo unloading longshoreman and his foreman" and similar terms, (b) in instructing the jury on unseaworthiness by directing the jury that "employees of each of such contractors" had a right to go aboard the vessel in connection with the performance of their work in "discharging said cargo from the vessel" and by referring to appellee in its instructions as a "foreman of the dock-working longshoremen, assisting on the dock in the discharge of the vessel's cargo", (c) in refusing to give certain instructions offered by the appellant upon negligence which included legal definitions of "invitee" and "licensee", (d) in refusing to give special interrogatories to the jury as proposed by appellant which it is contended "would have enabled determination of whether the jury found liability based upon unseaworthiness or negligence, or both", and (e) in denying the motion for a new trial upon the ground of excessive damages.

■ The liability of a shipowner for injuries to a seaman by reason of the unseaworthiness of the vessel is settled law. The Osceola, 1903, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760.

This right has been extended to a longshoreman injured aboard ship. Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 877, 90 L.Ed. 1099. The Court there said:

"On principle we agree with the Court of Appeals that this policy (of liability for unseaworthiness) is not confined to seamen who perform the ship's service under immediate hire to the owner, but extends to those who render it with his consent or by his arrangement. All the considerations which gave birth to the liability and have shaped its absolute character dictate that the owner shall not be free to nullify it by parcelling out his operations to intermediary employers whose sole business is to take over portions of the ship's work or by other devices which would strip the men performing its service of their historic protection. [328 U.S. at page 95, 66 S.Ct. at page 877.] * * *

" * * * Historically the work of loading and unloading is the work of the ship's service, performed until recent times by members of the crew. [328 U.S. at page 96, 66 S.Ct. at page 878.] * * * That the owner seeks to have it done with the advantages of more modern divisions of labor, does not minimize the worker's hazard and should not nullify his protection. [328 U.S. at page 96, 66 S.Ct. at page 878.] * * *

"Accordingly we think * * * that the liability arises as an incident, not merely of the seamen's contract, but of performing a ship's service with the owner's consent." 328 U.S. at page 97, 66 S.Ct. at page 878.

In Strika v. Netherlands Ministry of Traffic, 2 Cir., 1950, 185 F.2d 555, certiorari denied 341 U.S. 904, 71 S.Ct. 614, 95 L.Ed. 1343, the Court held that a longshoreman on a dock alongside the ship who was injured by the unseaworthiness of the ship's gear can recover against the shipowner. The Court there reasoned that if the obligation of maintenance and cure extended to a seaman injured ashore, that a seaman injured ashore by unseaworthy ship's gear can recover from the shipowner. The Court then said: "If a seaman can, we see no reason to question the ability of a longshoreman also to recover, for that follows from the reasoning of Seas Shipping Co.

v. Sieracki, supra, especially when it is read with the opinion in Swanson v. Marra Bros., supra, [328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045.]"

See, also, Valerio v. American President Lines, D.C., 112 F.Supp. 202, 203, where libellants, while working on the dock unloading cargo, became infected from handling part of ship's discharging equipment which the ship was required to maintain in a seaworthy condition. It was there said "[Libellants] were engaged in the maritime service of unloading the ship and were injured by contact with cargo known to be hazardous and requiring special precaution, * * * and accordingly the shipowner is also liable to them."

For the extension of the doctrine of unseaworthiness to other persons doing "seaman's work" see Pope & Talbot v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 207, 98 L.Ed. 143 and Halecki v. United New York & New Jersey Sandy Hook Pilot Ass'n, 2 Cir., 1958, 251 F.2d 708, 711, set out in the footnote.[1]

■ In the instant case the appellee, although performing most of his work on the dock in the moving of the ship's cargo from ship's tackle to its first place of rest (which was part of the ship's obligation),[2] was on board the ship when the accident happened. Under the testimony, he was coordinating the unloading of the cargo from the ship's hold to its place of rest on the dock.[3] We hold that

---

1. Pope & Talbot v. Hawn. Plaintiff, a carpenter, sustained personal injuries when he slipped and fell through an open hatch on defendant's vessel. At the time of the accident the ship was berthed at a pier. Loading of the vessel had been interrupted to make minor repairs on certain loading equipment. Plaintiff was an employee of an independent contractor who had been hired by defendant to make these repairs. In answering the defendant's contentions that this case was to be distinguished from the Sieracki case because here the plaintiff was not a longshoreman, the Court stated that the "legal protection was not based on the name 'stevedore' but on the type of work he did and its relationship to the ship * * *" Plaintiff's right to recover against defendant because of the unseaworthiness of the ship was affirmed.

Halecki v. United New York & New Jersey Sandy Hook Pilot Ass'n. Plaintiff's decedent, an electrician, was killed by noxious fumes while cleaning the engine room of defendant's vessel. Defendant's ship was in a repair yard. Decedent was an employee of a subcontractor of the repair yard hired to clean the generators in the ship's engine room. In holding that plaintiff could recover against defendant under the doctrine of unseaworthiness, the Court stated that " * * * the test is whether the work is of a kind that traditionally the crew has been accustomed to do, and as to that it makes no difference that the means employed have changed with time * * *".

2. (Transcript, p. 180: Deposition of Mr. Stewart, manager of Olympic Steamship Co.)

Answer: "Well, he (the plaintiff) is a supervisory employee who directs the work of the longshoremen on the terminal in the physical movement of the cargo."

(Transcript, p. 339: Cross examination of Fred G. Allinson, supercargo employed by Pope & Talbot.)

"Q. Well, now, is it necessary to carry that cargo away and store it in the dock, or can you just leave it at the ship's side? A. You've got to take it away from the ship's side. You wouldn't have any place to put it.

"Q. And you have to take it in and store it in the warehouse—isn't that correct? A. That's right.

(Transcript, p. 325-6: Stipulation of defense counsel.)

"However, we don't deny that it is part of the obligation of the steamship company as carrier to not only raise the cargo out of the hold and land it on the dock, but also to place it in the warehouse."

Question by the Court: "Where these men foremanned by the plaintiff were putting it, or engaged in putting it, at the time of the accident? A. That's right, yes, your Honor."

3. (Transcript, p. 191: Testimony of Stewart, manager of Olympic Steamship Co.)

"Q. But that is correct? He has to coordinate the two operations together, is that right? A. Well, he has to coordinate to have terminal employees and

the duty of providing a seaworthy ship and gear at the time of this accident extended to the appellee, whether or not appellee was on board the ship or on the dock. The test is, what was the nature of his work? He was performing a service for the ship in the discharge of its cargo. His employer was under contract with the shipowner to take the cargo from the shipside and to put it in a place of storage, and appellee was engaged in the performance of this work. The appellee's work was the work of a longshoreman and he was entitled to seaworthy gear while he was performing his services.

The appellant complains that the Court erred in its instructions by certain references it made therein to the plaintiff. A portion of the instructions is set out below.[4] The references were in ac-

---

equipment available at the end of ship's tackle to keep the cargo moving.

"Q. And I will ask you whether or not it is the custom and practice for a dock foreman to go aboard a vessel to give orders and to make arrangements for this coordination of ship's tackle and dock equipment. A. Yes, it is a common practice."

(Transcript, p. 295–296)

A. (by plaintiff): "The reason I went up—I went up to ask Mr. Peters if this gang was going to go home or shift to another hatch, and I had to have that information so I could let the drivers on the dock go or keep them.

"Q. Now, as far as that gang aboard the ship was concerned, if you had let your bull drivers go without consulting Mr. Peters, would the ship's gangs have been able to continue work? A. No.

"Q. Why? A. Because you have to have the drivers to give them the cargo or the dunnage or whatever they need."

4. (Tr. p. 402) By the admiralty law, which relates to ocean shipping activities and incidents connected therewith, the owner of a vessel is liable to indemnify a cargo unloading longshoreman and his foreman for injuries and damages proximately caused by the unseaworthiness of the vessel or its appurtenant appliances and equipment.

(Tr. p. 403) Under the admiralty law, which applies in this case, a longshoreman or his foreman assigned in unloading cargo from a ship does not assume the risk of an unsafe, improper and unseaworthy place to work. The shipowner is under a continuing, non-delegable duty to keep the ship and its appliances seaworthy, safe and in proper condition.

Recovery on the ground of unseaworthiness is limited to seamen and others such as longshoremen performing work for the ship such as discharging cargo which historically and until recent times was done by members of the ship's crew.

It was the duty of the defendant under its shipping contract with shippers to unload their cargo from the ship and store it on the floor within the warehouse on the dock. To perform that duty, defendant made cargo discharge arrangements resulting in two independent contractors using their employees in such cargo work. One of such contractors, Seattle Stevedore Co., through its employees unloaded the cargo from ship's hold onto the outside dock platform under ship's tackle, and the other such contractor, Olympic Steamship Co., moved the cargo onward from that place to a place of rest on the dock floor inside the dock warehouse.

(Tr. p. 404) The employees of each of such contractors in their work had the right to use defendant's unloading gear and equipment and to go upon such places under defendant's control as were reasonably necessary in the performance by such contractors' employees of their work of discharging said cargo from vessel hold to point of rest on the dock floor within the dock warehouse.

In order for the plaintiff to recover, you must in any event find from a preponderance of the evidence that the plaintiff was at the time of the accident in a place aboard the vessel where it was reasonably necessary for him to be in the performance of his duties as foreman of the dock-working longshoremen assisting on the dock in the discharge of the vessel's cargo.

If you do not so find, plaintiff would be in a status similar to that of a person without any employment connection with the unloading work at hand, and in that event plaintiff would not be entitled to recover in this case.

(Tr. p. 405) A vessel is unseaworthy when any of its integral appurtenances, appliances or equipment are not reasonably safe for the uses which the vessel's owner should reasonably expect will be made of such appurtenances and appliances.

Seaworthiness is a question of fact only and it is not dependent upon a showing of negligence on the part of the vessel

cordance with the uncontradicted facts in the case. The Court had a right to refer to the undisputed testimony describing the plaintiff's duties. The critical factual question was left for the jury: Did a preponderance of the evidence show that at the time of his injury it was reasonably necessary for Cordray to be on board the ship to perform his duties?

■ We find no error in the instructions given on unseaworthiness. The instructions properly left to the jury the determination of whether or not unseaworthiness had been proven.

■ The jury was likewise properly instructed on the issue of negligence. Appellant complains that instructions offered by it as to the difference in the duty owed by the shipowner to an invitee and to a licensee were not given by the Court. There are two answers to this. First, the evidence did not justify the giving of an instruction as to the duty owed to a licensee. Second, if the duty to provide a seaworthy ship and gear was owed to the plaintiff, and we hold that it

was, the question of whether or not negligence was proven became immaterial.

Appellant complains of the refusal of the trial Court to give special interrogatories to the jury as proposed by the appellant. These proposed special interrogatories are set out below.[5]

■ The question of whether or not special interrogatories should be given is a matter for the discretion of the Court. They are not required to be given in every case. We see no error in the refusal of the Court in this case to give the proposed special interrogatories.

■ Appellant also complains of the excessiveness of the verdict which was in the amount of $28,750.00.

As is usual in this type of case, medical testimony was offered by both sides. The inferences that could be drawn from each doctor's testimony varied widely. The plaintiff himself testified to a long course of pain and suffering, with inability to work as he had before the accident. Plaintiff's doctor said there was damage to an intervertebral disc near the seventh

---

owner. Where an integral portion of a vessel, its appliances, appurtenances and equipment is insufficient for its intended use and such use proximately results in injury, the owner is liable for such injury even though the defect rendering the appliance unseaworthy and insufficient was a latent defect. (Tr. p. 406) Upon consideration of all the evidence in this case, if it remains doubtful in your minds whether the injuries complained of resulted from the specific unseaworthiness as charged by plaintiff against the defendant, or from some other cause, then the plaintiff cannot recover for unseaworthiness.

The burden is on plaintiff to prove by a fair preponderance of the evidence that the defendant's ship P&T Adventurer was unseaworthy as alleged and that as a proximate result of such unseaworthiness plaintiff sustained damages as alleged in his complaint.

5. Interrogatory No. 1: Was the condition of ship's gear and equipment a proximate cause of this accident?
Answer .......... ("Yes" or "No")
Interrogatory No. 2: If your answer to the preceding interrogatory is "yes", was this accident caused solely or in

part by the condition of the ship's gear and equipment?
Answer: Solely ... ("Yes" or "No"),
In part ... ("Yes" or "No")
Interrogatory No. 3: Was the manner in which longshoremen, employed by a third party, used the ship's gear and equipment a proximate cause of this accident?
Answer .......... ("Yes" or "No")
Interrogatory No. 4: If your answer to Interrogatory No. 3 is "yes", was this accident caused solely or in part by the manner in which longshoremen, employed by a third party, used the ship's gear and equipment?
Answer .......... ("Yes" or "No")
Interrogatory No. 5: Was the plaintiff negligent?
Answer .......... ("Yes" or "No")
Interrogatory No. 6: If your answer to Interrogatory No. 5 is "yes", was such negligence of plaintiff the sole or a contributing cause of the accident, and if contributing, in what percentage?
Answer ..... ("Sole")
..... ("Contributing"),
.... (Fill in percentage plaintiff's negligence contributed)

cervical vertebra and that this might result in surgery. He further testified that in his opinion the plaintiff's injuries were permanent.

The determination of whether a verdict is excessive is first a matter for the trial judge. He is in a better position to judge of the seriousness of claims of injury than is an appellate tribunal. The trial Court in this case considered this matter on the motion for a new trial and apparently saw no reason to grant the motion on the ground of excessive damages, and we see no error in its action.

We have examined all points raised by appellant, and can find no ground for the reversal of the judgment.

The judgment is affirmed.