George WEIGEL, Libelant,

v.

THE MV BELGRANO, her engines, tackle and gear, and any and all persons claiming any interest therein, and Partenweederei, M. S. Belgrano, Owner and Operator, Seekonter Line, Charterer and/or Operator, Respondents.

Rudolph A. OETKER, Claimant,

v.

BRADY–HAMILTON STEVEDORE COMPANY, a corporation, Third-Party Respondent.

Civ. No. 10027.

United States District Court
D. Oregon.

April 14, 1960.

See, also 188 F.Supp. 605.

**104**

Frank H. Pozzi, Pozzi & Wilson, Portland, Or., for libelant.

Erskine B. Wood, Wood, Matthiessen, Wood & Tatum, Portland, Or., for respondents.

Nathan J. Heath, Gray & Lister, Portland, Or., for third-party respondent.

EAST, District Judge.

### Nature of Cause

This is a libel in personam and in rem with foreign attachment for damages resulting from personal injuries sustained by libelant as a result of the alleged unseaworthiness of the MV Belgrano ("vessel") and the negligence of the respondents.

The respondents impleaded Brady-Hamilton Stevedore Company ("stevedore") as third-party respondent under Admiralty Rule 56, 28 U.S.C.A. in a cause of indemnity.

The libelant at the time of the accident involved was a longshoreman employee of stevedore then under contract to bring aboard and stow the vessel with cargo, including lumber. The question of the claim of respondents for indemnity from stevedore has been segregated and reserved until adjudication of libelant's claim.

The segregated issue of liability to libelant and his damage has been submitted to the Court following a trial by the Court and the filing of brief.

### Pertinent Undisputed Facts

On or about October 10, 1958, the vessel was lying adjacent to the dock at Terminal No. 1 on the Willamette River in the Port of Portland, Portland, Oregon, and longshoremen unemployed by the stevedore were immediately engaged in moving (topping) the starboard boom at No. 1 hatch in order to bring aboard lumber cargo from the dock when the boom and its rigging fell and struck the libelant, who was working on the dock as a fellow longshoreman, causing him personal injuries.

This Court has admiralty and maritime jurisdiction of this cause in rem of the vessel and in personam of the named parties.

### Court's Findings of Fact as to Liability

This Court finds that:

Libelant was struck with the falling boom while he was engaged in his duties as a dockworking longshoreman and particularly operating a tractor in reverse motion and pulling with a tow line a railroad car, then loaded with some of the lumber cargo, upon a permanently fixed railroad spur line on the dock along shipside. The purpose was to place the lumber-laden railroad car under and within the reach of the vessel's gear so as to load the lumber upon the vessel.[1] (Figure 1.)

---

1. Respondents' Exhibit 54(16).

FIGURE 1

The falling boom struck the libelant without any notice or warning to him.

The vessel was of German design, newly-built, and engaged as a freighter, and she appeared clean.

The vessel's starboard boom at her No. 1 hatch had been and was at the time of the accident fitted, among other things, with a topping lift winch drum ("lift gear") of German design. This gear was a permanently affixed appurtenance of the vessel and, unlike the common American style of chain and shackle fastening topping gear, was semi-automatic in operation.[2]  (Figure 2.)

FIGURE 2

The larger wire rope wound on the left portion of the drum on the lift gear and extending upwards between the words "notches" and "pawl" extends on upwards and through a block on the mast and is made fast near the top of the boom involved.  The lift gear is stationed just abaft of the starboard winch at No. 1 hatch.[3]  (Figure 3.)

FIGURE 3

The smaller steel rope wound on the right portion of the drum has been referred to as "topping lift pennant" and "pigtail line" ("pigtail line"), and the unwound portion thereof lies free on the deck when not in use.  The free end of the pigtail line is equipped with a "hook," a "dog" or a "pawl" ("dog").[4]  (Figure 4.)  The "nigger head" or "gypsy head" ("gypsy head") on the winch has a hole or cutting through its outside rim.[5]  (Figure 5.)  To operate the boom lift

2. Attached to respondents' interrogatories to ship's carpenter, Thomas Thomasen, on file herein.

3. Respondents' Exhibit 54(1).

4. Respondents' Exhibit 67(a).

5. Third-Party's Exhibit 100(c).

gear the dog is inserted in the hole in the rim of the gypsy head.[6] (Figure 6.) This pigtail line dog with the cutting in the rim of the gypsy head is also of German concept and design and, when the dog is properly inserted and locked by a twist in the gypsy head opening [7] (Figure 7.), the pigtail line is made fast to the gypsy head and cannot be separated by direct pull of the winch unless there is a failure of the metals. When the lift gear is operating normally, the strain of the winch causes an unwinding of the pigtail line and causes a reverse winding of the boom topping wire rope upon the drum and a lifting of the boom. Slack upon the pigtail line will cause an unwinding of the topping wire rope by the weight of the boom, a lowering thereof, and a winding of the pigtail line upon the drum. The drum of the lift gear has as an integral part thereof, at each end, a permanently fixed circular ratchet or pawl rim or wheel made of cast metal provided with a series of cammed ratchets on which permanently attached

FIGURE 4

FIGURE 5

FIGURE 6

FIGURE 7

6. Respondents' Exhibit 54(6).

7. Respondents' Exhibit 54(8).

but free rising and falling pawls ride and rise and drop into the intervening notches by gravity. These two pawls are rigidly connected together with an iron bar and operate on a single axle. When one pawl is up so is the other, and vice versa. When the lift gear in the boom-lifting operation functions correctly according to intent and design, the pawls freely ride and rise upon the cammed ratchets and drop automatically by gravity into the notches, thus forming a locking device to prevent the drum from turning back under the weight of the boom following an intentional slack or an unexpected failure of the pigtail line. When the gear is used to lower the boom, it is necessary for a longeshoreman to manually hold or otherwise prevent the pawls from falling by gravity into the notches. The action of a longshoreman in lowering or letting the pawls fall into the notches will lock the drum and prevent the continued lowering of the boom or a falling of the boom upon a sudden parting or failure of the pigtail line.

The intent and design of the lift gear is an improvement upon the mentioned American gear and is a safe and is in nowise an inherently dangerous appurtenance when functioning properly. There would be a malfunction of the gear according to design and intent if the pawls did not freely ride and rise and drop by gravity or in anywise fail to drop freely by gravity when released from a manual holding.

Immediately prior to the commencement of the operation leading up to the accident, the ratchet notches and the pawls were in a locked position and the lift gear was steady under the weight of the boom. The work of bringing aboard the lumber at No. 1 hatch required a topping of the boom in order to place the same in a working position, and the winch driver called to a ship longshore-

man and asked for "a hand" in attaching the free end of the pigtail line to the gypsy head. The winch operator did not see this operation, and the longshoreman involved can give no satisfactory account of what he did in the way of fixing the free end of the pigtail line to the gypsy head. In any event, it was somehow attached, but evidently not properly. The winch driver took up the slack in the pigtail line, put strain thereon, and commenced the lifting of the boom. The winch driver did not hear the "clanking" of the pawls (dropping of the pawls in the notches in the ratchet rims). After raising the boom approximately three-four feet, the driver stopped the winch, braked it, and started astern to see what was wrong. Under the weight of the boom, the pigtail line started to slip on the gypsy head and the boom lift wire rope on the drum of the lift gear started to unwind. The boom in its fall gathered momentum, and the flailing free end of the pigtail line prevented the winch driver from manually putting stress upon the same. The boom, uncontrolled, fell to the starboard side of the vessel across the dock and struck the libelant. From the commencement of the raising of the boom, the unwinding of the drum, and throughout the fall of the boom, the pawls had failed to fall into the notches by gravity or otherwise.[8]

On the day before the accident, while in the process of topping the boom involved through the use of the lift gear, the pawls had locked in an upright position and failed to properly function by falling under gravity into the locking position, and a longshoreman had used a piece of dunnage to strike and knock the pawls into position.

Court's Conclusions of Law as to
Unseaworthiness and Negligence

■■ That there was a malfunction in the intent and design and of the lift

---

8. There is no evidence in the record of any foreign materials in and about the working elements of the ratchets, notches, pawls and the bearing of the pawl axle, nor physical damage of the working parts immediately prior to the accident. The law of physics tells us that it is reasonable to infer that some ab-

stract and necessarily patent binding force or strain among the working parts prevented a normal automatic mechanical action and function (dropping of the pawls by gravity) and thereby destroyed the usefulness and safety of the gear and rendered the same dangerous and unsafe.

gear during the operation of the lifting of the boom in that the pawls failed to freely ride the cammed ratchets and drop freely into the notches is self-evident. Otherwise, there would have been a maximum drop of the boom to the extent of some seven inches or a destruction of the locking device of notch and pawl, which there was not. Therefore, the Court concludes:

(1) That the said vessel was unseaworthy in that:

"3. That (pawls) on the ratchet in the topping lift gear was (were) defective and inadequate in that it (they) did not drop into each cog as the boom was hoisted so as to prevent the boom from falling." [9]

(2) That the respondents and the claimant were negligent in:

"4. Failing to properly inspect said vessel and particularly the said ratchet and (pawl) device to said hatch to determine the defective nature of same * * *" (Reasonable inspection would have disclosed the malfunctioning of the pawls, known to the longshoreman the day before.)

"5. Failing to provide (the) libelant with a safe place to work * * *"

(3) That said unseaworthiness of the vessel and concurring negligence of the respondents and claimant were the proximate causes of the falling of the boom [10] and libelant's resulting injuries.

9. See Hagans v. Farrell Lines, 3 Cir., 1956, 237 F.2d 477, where the malfunction of an automatic brake (otherwise a safe device) on a winch failed to hold a load and permitted a "drift," and some five or more feet of cable to run off the winch drum, causing an injury to a shipworking longshoreman. The winch was held to be defective and rendered the vessel unseaworthy.

See also Crumady v. The Joachim Hendrik Fisser, 1959, 358 U.S. 423, at pages 425, 426, 79 S.Ct. 445, at page 446, 3 L.Ed.2d 413 (Mr. Justice Douglas):

"The safe working load of the boom and cargo runner and topping-lift handling the load at the time of the accident was three tons each. This equipment, which was part of the unloading and loading gear of the vessel, was in good condition. The winch, which served the boom, had a 'cut off' device or circuit breaker. (An automatic device to prohibit reverse action.) It was set to shut off the current on the application of a load of about six tons, which was twice the safe working load of the unloading gear. The circuit breaker operated perfectly, cutting off current at the point of stress for which it was set. It had been set to operate at a load slightly more than twice the safe working load of the unloading gear (malfeasance) by employees of the ship before the winch was turned over to petitioner's fellow employees for operation. * * *

"The work of loading and unloading is historically 'the work of the ship's service.' * * *

"This protection against unseaworthiness imposes a duty which the owner of the vessel cannot delegate. * * * Unseaworthiness extends not only to the vessel but to the crew * * * and to appliances that are appurtenant to the ship. * * * And as to appliances the duty of the shipowner does not end with supplying them; he must keep them in order. * * * The shipowner is not relieved of these responsibilities by turning control of the loading or unloading of the ship over to a stevedoring company. * * * We need not go so far to sustain the District Court here. For there is ample evidence to support the finding that these stevedores did no more than bring into play the unseaworthy condition of the vessel. The winch—an appurtenance of the vessel—was not inherently defective as was the rope in the Mahnich case [Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561]. But it was adjusted (neglected and permitted to become inoperable—nonfeasance) by those acting for the vessel owner in a way that made it unsafe and dangerous for the work at hand. While the rigging would take only three tons of stress, the cut-off of the winch—its safety device—was set at twice that limit. This was rigging that went with the vessel and was safe for use within known limits. Yet those limits were disregarded by the vessel owner when the winch was adjusted. The case is no different in principle from loading or unloading cargo with cable or rope lacking the test strength for the weight of the freight to be moved. In that case the cable or rope, in this case the winch, makes the vessel pro tanto unseaworthy." 358 U.S. at pages 427–428, 79 S.Ct. at page 447.

10. Assuming the fastening devices of the free end of the pigtail and in the gypsy

Court's Conclusions as to Liability
to Libelant

The Court concludes that the libelant at the time of the accident was engaged in performing a part of the ship's service as a longshoreman in the process of loading and stowing her cargo. Particularly he was engaged in moving or bringing this lumber cargo from its last place of rest following handling by others to a position on the dock shipside in order to be reached by the ship's gear and tackle. In the language of Circuit Judge Hamlin of the Ninth Circuit:

"The appellee's (libelant's) work was the work of a longshoreman and he was entitled to seaworthy gear while he was performing his services." Pope & Talbot, Inc. v. Cordray, 9 Cir., 1958, 258 F.2d 214, 218.

And, this "duty of providing a seaworthy ship and gear at the time of this accident extended to the (libelant), whether or not (libelant) was on board the ship or on the dock."

That in the Cordray case the appellee was a foreman of dock longshoremen and he had the duty of coordinating the activities of the dock-working longshoremen and the ship-working longshoremen in the unloading of the vessel. Surely there can be no distinction between a (1)

head were defective or that they were improperly united by the longshoreman, such condition *was not* the cause of the falling of the boom. It is true that if these locking devices had functioned properly the pigtail line could not have become free and slipped upon the gypsy head. It appears from the evidence that there was sufficient friction by the winding of the pigtail line upon the gypsy head to raise the boom some three or more feet and it was only when the winch was braked that the weight of the boom overcame the friction of the pigtail line upon the gypsy head. Had the notch and pawl devices on the lifting gear functioned properly, the winch would have been stopped and braked, more friction would have been created by the winding of the pigtail line upon the gypsy head, and there could not have been the overcoming stress of the weight of the boom upon the pigtail line. A proper functioning of the locking device on the gypsy head would in all probability have stopped or prevented the fall; however, any improper functioning of the locking device was not the cause of stopping the operation of the winch and the following sequence of events directly resulting in the loss.

Respondents can build no avenue of escape from the language of Titus v. The SS Santorini, D.C., 152 F.Supp. 63, affirmed 9 Cir., 258 F.2d 352. There a preventer wire and guy rope for a starboard boom parted under the weight of a sling load as it came up and aboard. Following the trial and after a study of "the complete record and all the evidence presented" (152 F.Supp. 64), my able colleague from Idaho, sitting on this bench, could find no causation for the parting of the otherwise ample wire and rope which was attributable to and rendered the vessel unseaworthy.

"[3, 4] As has been stated the burden rests on the libelant to prove the allegations of unseaworthiness, and where there is nothing shown to the contrary, it may be presumed that was the case merely because the accident happened while the gear was being used in the usual and customary manner. However, here the presumption is overcome with evidence to the contrary, making it necessary that there be some further affirmative showing on the part of the libelant that the unseaworthiness alleged existed. There is no such showing here." 152 F.Supp. 65.

The trial court

" * * * was expressing an abiding belief that appellant had not proved what caused the breaking other than that it had been shown that 'the force exerted on it was greater than its breaking strength.'" 258 F.2d at page 354.

"The trial court on the facts here had the privilege of being honestly puzzled as to causation. Without a conviction that the accident happened because of a definite condition for which the appellee was to blame, it had no duty to find for the injured stevedore." 258 F.2d at page 356.

Titus might have saved the vessel had some negligent act of the longshoreman in handling the locking devices of the pigtail line dog and gypsy head been the proximate cause of the failure of the gear.

"This court is not convinced that the instantaneous acts of a fellow longshoreman rendering the equipment unseaworthy and injury to the longshoremen are chargeable to ship as unseaworthiness." 258 F.2d at page 354.

Referring to Grillea v. United States, 2 Cir., 232 F.2d 919, 922.

(Cordray) dock-working longshoreman moving cargo from the reach of the ship's tackle "to its first place of rest" on shore (258 F.2d 214, 215) during the discharge of cargo; and (2) (instant case) a dock-working longshoreman bringing cargo from its last place of rest on shore within the reach of the ship's tackle during the loading of cargo. Both dock-working longshoremen stand in a like degree of relationship to the fellow ship-working longshoremen. Reason dictates they respectively are engaged in the work of the service and business of the vessel, which is the ultimate test.[11]

Therefore, the vessel is liable to the libelant for her unseaworthiness, which concurred with the negligence of the respondents and claimant in causing libelant's injuries.

### Court's Findings of Fact and Conclusions of Law as to Libelant's Injuries and Damages

The Court finds that:

■ The libelant at the time of the accident was an able-bodied man of 58 years, physically able to perform the regular and normal duties required of him in his position of a tractor-driving dock-working longshoreman.

As a result of being struck by the boom, libelant suffered nervous shock, physical and mental pain and suffering, a brain concussion and a skull fracture, causing complete unconsciousness of several hours' duration, broken hip, a memory loss of temporary duration, severe lacerations and contusions, a severe tearing, twisting and wrenching of the muscles, tendons, ligaments and soft tissues of his limbs and body and soft tissues of his head. As a result of said injuries the libelant was temporarily totally disabled and impaired from performing any work or labor from the date of the accident until the month of June-July, 1959, at which time his medical doctor advised him to return to work, or for a reasonably ascertained period of nine calendar months. Thereafter, until the date of trial on February 23, 1960, or for a period reasonably determinable as seven and one-third calendar months, libelant was partially totally disabled from performing any work for gain. Some of said injuries have caused a permanent partial loss of the body functions in the region of the neck and shoulders and have permanently but partially impaired libelant's ability to work in his prior occupation. The libelant has no education or occupational training which would enable him to engage in work other than that in the allied fields of a longshoreman.

The libelant's wages from and after the date of the accident until the time of trial could have been reasonably expected to average the sum of $573.39 per calendar month. The libelant has, since the date of the accident until the date of trial, on account of his injuries, incurred reasonable and necessary doctor, hospital and medical expenses in the amount of $1,032.55.

Therefore, the libelant is entitled to recover as lost wages during this period of total and partial disability to work, the sum of $7,675 and is further entitled to recover the sum of $1,032.55 medical expenses, and as general damages the sum of $32,500.

Proctor for the libelant is requested to submit appropriate form of decree and judgment, adopting as a part thereof and as the Court 's findings of fact and conclusions of law the foregoing.

11. " '* * * Historically the work of loading and unloading is the work of the ship's service, performed until recent times by members of the crew. [(Seas Shipping Co. v. Sieracki) 328 U.S. at page 96, 66 S.Ct. at page 878.] * * * That the owner seeks to have it done with the advantages of more modern divisions of labor, does not minimize the worker's hazard and should not nullify his protection. [328 U.S. at page 96, 66 S.Ct. at page 878.] * * *
" 'Accordingly, we think * * * that the liability arises as an incident, not merely of the seamen's contract, but of performing a ship's service with the owner's consent.' 328 U.S. at page 97, 66 S.Ct. at page 878."
Pope & Talbot, Inc. v. Cordray, 258 F.2d 214, at page 216.