**In re SMITH–RICE NO. 4, on the Petition of Smith-Rice Company, Smith-Rice Derrick Barges, Inc., Smith-Rice Barge No. 1 Company, Smith-Rice Barge No. 2 Company, and Smith-Rice Barge No. 3 Company, and Smith-Rice Barge No. 4 Company for Exoneration from or Limitation of Liability.**

**In re SMITH–RICE NO. 18 on the Petition of Smith-Rice Company, Smith-Rice Derrick Barges, Inc., Smith-Rice Barge No. 1 Company, Smith-Rice Barge No. 2 Company, and Smith-Rice Barge No. 3 Company, and Smith-Rice Barge No. 4 Company for Exoneration from or Limitation of Liability.**

**Nos. 29525, 29526.**

United States District Court,
N. D. California.
July 15, 1968.

---

Gladstein, Andersen, Leonard, Sibbett & Patsey, with Norman Leonard, San Francisco, Cal., for claimants Morgan, Cooke and Kole.

Walkup, Downing, Walach & Sterns, by Robert Walach, San Francisco, Cal., for claimant Carroll.

Fouke, Wertsch & Hayes, by James T. Igoe, San Francisco, Cal., for claimant Sipes.

Partridge, O'Connell & Partridge, by Robert G. Partridge, San Francisco, Cal., for claimants Pacific Ship Repair, Inc., and Pacific Shops, Inc.

Lillick, McHose, Wheat, Adams & Charles by Graydon S. Staring and Alf R. Brandin, Wallace, Pasco, Norton & Ray, by William R. Ray, San Francisco, Cal., Associate Counsel for petitioners.

## MEMORANDUM OPINION FINDINGS OF FACT AND CONCLUSIONS OF LAW

WOLLENBERG, District Judge.

This is a petition for exoneration from or limitation of liability brought pursuant to 46 U.S.C. § 183 et seq. While several employees of petitioner Smith-Rice Company were working on a 30-ton Colby crane, said crane collapsed backwards causing their deaths, giving rise to various claims against petitioners, which are now made the subject of this petition. The petition alleges petitioners to be without fault, and in the event that they are found liable, they ask that their liability be limited to the value of the respective barges which were engaged in the work performed on the crane on the day of the accident. Claimants have alleged liability based upon unseaworthiness and general negligence, and ask that the petition for limitation of liability be denied.

This matter came on for trial on February 5, 1968 and lasted six trial days. After considering the evidence presented, the memoranda filed by respective counsel, the proposed findings of fact and conclusions of law lodged by respective counsel, and the Court being fully advised in the premises, it now makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. Petitioners Smith-Rice Company, Smith-Rice Derrick Barges, Inc., Smith-Rice Barge No. 1 Company, Smith-Rice Barge No. 2 Company, Smith-Rice Barge No. 3 Company and Smith-Rice Barge No. 4 Company are corporations which have been sued in certain State Court proceedings, in which claims for damages are made based upon allegations that Petitioners were the owners of two derrick barges, Smith-Rice No. 4 and Derrick Barge No. 18, and that the Petitioners warranted the seaworthiness of such barges and breached their warranties and negligently operated such barges, in connection with the collapse of a certain Colby crane, on January 4, 1965. It was stipulated by all parties during trial that Petitioners Smith-Rice Derrick Barges, Inc., Smith-Rice Barge No. 2 Company and Smith-Rice Barge No. 3 Company be exonerated.

2. The petitioners herein are Smith-Rice Company (herein called "Smith-Rice"), Smith-Rice Derrick Barges, Inc. (herein called "Derrick Co."), Smith-Rice Barge No. 1 Company (herein called "No. 1 Company"), Smith-Rice Barge No. 2 Company (herein called "No. 2 Company"), Smith-Rice Barge No. 3 Company (herein called "No. 3 Company"), and Smith-Rice Barge No. 4 Company (herein called "No. 4 Company").

3. Each of said petitioners is a separate and independently-created corporation, organized and existing under and by virtue of the laws of the State of California.

4. Smith-Rice is engaged in the business, among other things, of the marine transport of cargo.

5. Companies Nos. 1, 2, 3 and 4 are, respectively, owners of barges and equipment thereon which are sometimes leased out to various other concerns for use in marine transportation under bareboat charter. At other times, the barges are supplied to Smith-Rice for its use in specific business ventures wherein Smith-Rice is operating agent of the barge-owning companies. The latter situations are governed by a standing contractual arrangement whereby Smith-Rice is compensated for its performance

of services by receiving a stipulated portion of the net profits of the venture, and the remaining profit is paid over to whichever barge-owning company or companies supply the barges used in such venture.

6. The barges Smith-Rice No. 4 and Derrick Barge No. 18 were, at all material times, substantially identical, non-seagoing, steel crane barges of 691 gross tons, about 120 feet long and 60 feet wide, which were not self-propelled but were moved only by being towed to and from job sites where they might be needed. Title to Smith-Rice No. 4 was held by Petitioners Smith-Rice Barge No. 1 Company and title to Derrick Barge No. 18 was held by Petitioner Smith-Rice No. 4 Company and each of the barges was, at all material times, in the possession of and being operated and controlled by Petitioner Smith-Rice Company.

7. The Claimants in these proceedings are, respectively, the alleged heirs at law of William S. Carroll, Arthur Joseph Cooke, III, Matthew Kole, James Morgan, and Stanley Sipes, all of whom lost their lives in the collapse of the Colby crane, on January 4, 1965, at Alameda, California. The claim with respect to decedent William S. Carroll has previously been compromised and a Consent Judgment has been entered upon the compromise. Claimants' decedents, who lost their lives in the collapse of the Colby crane, were employees of Petitioner Smith-Rice Company.

8. Edgar Raymond Rice (herein called "E. R. Rice") holds the following offices and positions with the said companies: Smith-Rice, formerly Assistant Secretary and now Vice-President, and also General Manager; Companies Nos. 1, 2, 3 and 4, Assistant Secretary and General Manager.

9. In each of said companies the mother of E. R. Rice, Mrs. Mathilda M. Rice, is President.

10. All of the outstanding shares of stock of Smith-Rice and Companies 1, 2, 3 and 4 are owned by the Charles N. Rice Company, a separate and independent corporation, of which Mathilda M. Rice is President and E. R. Rice is Vice-President.

11. All of the outstanding stock of Charles N. Rice Company is held as follows: 417 shares are held between Mathilda Rice, E. R. Rice, the sister of E. R. Rice (Patricia Rice Brandon), the Charles N. Rice Irrevocable Trust (for the benefit of E. R. Rice and Patricia Rice Brandon), and the Charles N. Rice Revocable Trust (for the benefit of Mathilda M. Rice); 10 shares are held by George Mitchell, who is also employed by Smith-Rice as its Supervising Engineer, and is the Responsible Managing Employee of that Company for purposes of state licensing; the remaining 73 shares authorized to be issued are held as treasury stock.

12. All of the foregoing facts are found to have been true throughout the month of December, 1964 (when the project hereinafter described was entered into), on January 4, 1965, when the herein mentioned accident occurred, and on or about August 19, 1965, when the petitions for exoneration from or limitation of liability were filed herein.

13. The land-based crane involved was a gantry crane, of 30-ton capacity, with a boom about 75 feet long, manufactured by the Colby Crane & Manufacturing Co. The crane was located in the Moore Drydock Yard, in Alameda, California, adjacent to the Oakland Estuary, and was designed to operate upon rails extending at one end onto a pier constituting an extension of the land in the yard at the edge of the Estuary. Prior to the casualty the crane had been sold by the owners of the yard in which it stood to Pacific Coast Engineering Company, which had a yard also adjacent to the Oakland Estuary.

14. Under date of December 11, 1964, Smith-Rice contracted, at a price of $6,-850, with Pacific Coast Engineering Company (hereinafter referred to as "Paceco") to furnish labor and equipment necessary to dismantle and transport a certain 30 ton Colby crane from

its location at Pacific Ship Repair, Inc., Alameda, California, to Paceco's yard approximately one mile distant. The said contract price covered transportation of the crane by barge or barges on the waters of the Oakland Estuary, and any necessary disassembling of the crane at the place of departure to facilitate loading on the barges, as well as reassembly of the crane at its point of destination. Paceco was to remove the crane rail at the loading point and place it in a suitable area for Smith-Rice to load aboard the barge or barges.

15. The foregoing contract was entered into on behalf of Smith-Rice by, and under the supervision and direction of, E. R. Rice.

16. On December 2, 1964, George F. Mitchell, a graduate in mechanical engineering and registered civil engineer employed by Smith-Rice Company as supervisor and engineer, on orders of Edgar R. Rice, looked at the crane to consider the potential method for moving the crane. Thereafter, on December 15, 1964, George F. Mitchell, with a gang consisting of Matthew Kole, James Morgan, and two other men, removed the wire from the load purchase and stripped the crane, changed the position of the boom of the crane and moved the crane between 200 and 300 feet from inland to the inland edge of the pier. On December 17 and 18, 1964, Mr. Mitchell, with a gang consisting, on the 17th, of Matthew Kole, James Morgan, William S. Carroll and three other men and consisting, on the 18th, of Matthew Kole and William S. Carroll and one other man, carried out substantial additional dismantling procedures in preparation for the disassembly of the crane. In connection with the movement of the Colby crane to the inland edge of the pier on December 15, 1964, Smith-Rice No. 4 was brought to the scene on that day and one of its winches used to supply power for the movement. Apart from that the barges were not involved in any of the work done prior to January 4, 1965.

17. This work was interrupted on or about December 18, 1964, due to a financial disagreement between Smith-Rice and Paceco. Under date of December 21, 1964, the aforementioned contract was canceled in its entirety, on instructions of E. R. Rice. Under date of December 22, 1964, a contract was entered into between Bigge Drayage Company, a corporation, and Smith-Rice (E. R. Rice, Vice-President, signing on its behalf), whereby Smith-Rice undertook to continue with and conclude performance of the same project at the same price of $6,850, for whose payment Bigge Drayage Company became responsible. Pursuant to said contract, Smith-Rice resumed work on said project on the morning of January 4, 1965, and was engaged therein at the time of the happening of the accident hereinafter mentioned, occurring on the afternoon of the same day.

18. On January 4, 1965, barges 4 and 18 were towed by tugboat to the Schiller Street Pier of Pacific Ship Repair, Inc. and were positioned and moored alongside the dock in accordance with directions given by George Mitchell. The barges were lashed to the dock as well as to each other.

19. During the morning hours and in the early afternoon the Colby crane was hauled a distance of approximately 100 yards from its then location to the outer edge of the dock. Propulsion was provided by means of power supplied by Barge No. 4. The method used was to secure a winch line from Barge No. 4 to the front end of the crane to permit forward pull, and another winch line from Barge No. 18 was made fast to the rear end of the crane in a manner that would make it possible to assist in controlling the forward movement of the crane and to pull it backward.

20. Upon orders from E. R. Rice and/or George Mitchell, the following men climbed aloft to the super-structure of the Colby crane to perform the work necessary to load the crane onto the barges: Matthew Kole, Arthur Cooke, Stanley Sipes, James Morgan and William Carroll. They worked at a height of 70 feet from the dock.

21. For the purpose of, and as an incident of, continuing the dismantling of the Colby crane which had commenced on earlier dates, Smith-Rice No. 4, and Derrick Barge No. 18 were connected to the boom of the Colby crane for the specific purpose of relieving the supporting cables and heel pins of the weight of the boom so that the cables and pins could be removed and the boom disconnected from the cab structure. The work of affixing the slings was done by Kole and Carroll. They were then joined by Morgan, Cooke and Sipes in dismantling the rigging, lashing the sheeves, coiling the wires and securing them to the car body. The topping lift was lowered and secured to a part of the crane. While both crane barges were thus connected, and with the five decedents on and about the boom and cab of the Colby crane, proceeding with the work of dismantling, the cab tipped back and the cab and the boom fell to the pier below, casting the five men down and causing their deaths.

22. The collapse of the crane was caused by miscalculation of the location of the center of gravity of the cab and machinery deck prior to the commencement of the job. As a result of that miscalculation, certain restraining devices were removed, without the substitution of others, during the dismantling work done on the crane in December 1964, which removal and failure to substitute would not have caused the collapse had the center of gravity been in accordance with the calculations. All of such calculation and removal was non-maritime work not involving either of the two barges Smith-Rice No. 4 and Derrick Barge No. 18.

23. The attachment of Smith-Rice No. 4 and Derrick Barge No. 18 to the boom of the Colby crane was only a condition and not the proximate cause of the collapse of the Colby crane and the deaths of decedents.

24. As alleged in the Claimant's Claim on file herein, on January 4, 1965, decedent Sipes "was engaged in his occupation as an operating engineer in the employ of SMITH-RICE COMPANY and was engaged in the ordinary course and scope of his occupation and employment, in this instance, dismantling a Colby crane." At no time material to these proceedings was such decedent performing the traditional work of a seaman, but at all such times, he was in fact performing work normal and traditional for land-based operating engineers.

25. As alleged in Claimants' Claims on file herein, on January 4, 1965, each of the decedents Cooke, Kole and Morgan "was engaged in his occupation as a rigger in the employ of Smith-Rice Company and was engaged in the ordinary course and scope of his occupation and employment, in this instance, dismantling a Colby crane." At no time material to these proceedings were such decedents performing the traditional work of seamen, but at all such times they were in fact performing work normal and traditional for land-based riggers.

26. Smith-Rice Company, as employer, secured the payment of workmen's compensation to the decedents and their survivors under the California workmen's compensation law and the survivors have applied for and been awarded and received compensation benefits, as to all decedents except Morgan.

27. Claimants have failed to prove, and it is not true, that decedents were seamen and members of the crew, or doing the traditional work of seamen and members of the crew, of the Barges, Smith-Rice No. 4 and Derrick Barge No. 18, or that such barges had, or ever traditionally had, such crews.

28. At no time did any part or parts of the land-based crane which Smith-Rice Company was dismantling become cargo of either Smith-Rice No. 4 or Derrick Barge No. 18, and at no material time was any decedent engaged in handling cargo of either barge.

29. Claimants have failed to prove, and it is not true, that the barges or the decedents and their fellow riggers and operating engineers engaged in the

dismantling operations were, at any material time, inadequate to perform the tasks assigned to and intended to be performed by them or failed to do so.

30. Claimants have failed to prove, and it is not true, that, at any material time, Smith-Rice No. 4 or Derrick Barge No. 18 were not in all respects reasonably fit for their intended service and seaworthy.

31. Claimants have failed to prove, and it is not true, that they are members of the crew or seamen.

32. The deaths of the decedents were not proximately caused by any unseaworthiness of the barges Smith-Rice No. 4 or Derrick Barge No. 18.

■ In making these findings, the Court has been fully aware that this case presents a number of complex factual and legal issues. The starting place for any discussion is the well accepted principle that in order for a shipowner to limit or be exonerated from liability, it must be shown either that no liability exists, or if such liability exists, that it was without the privity or knowledge of the shipowner. The 84-H, 296 F. 427 (2d Cir. 1923).

Claimants' main contentions are that petitioners are liable because decedents were performing work traditionally done by seamen at the time of the accident, and hence they are entitled to the warranty of seaworthiness, which was breached in the following respects: (1) The gear, equipment, and slings of the derricks on Barges No. 4 and No. 18 failed to perform their assigned task of holding the crane's boom steady and secure as decedents were working on the crane, (2) The work-plan and work-method employed by petitioners constituted an improper and unsafe method of handling the Colby crane, thus making it hazardous for the gear, tackle, and equipment of Barges 4 and 18 to be used in the manner in which they were actually used.

Petitioners deny liability on the following grounds:

1) That decedents were not performing the traditional work of seamen at the time of the accident.

2) If decedents were doing seamen's work, the accident was not caused by any unseaworthy condition of the barges or gear.

3) That claimants are barred from recovering damages based upon unseaworthiness by virtue of the exclusive remedy provided in the California Labor Code [section 3601(a)].

4) That claimants cannot recover under the Jones Act since they are not seamen or members of a crew.

5) That if petitioners are found liable, they are not in privity with or do not have knowledge of the causes of the accident.

■ It is now well settled that a shipowner's duty to provide a seaworthy ship is not limited to only those persons who are seamen, but extends to all persons who are performing work of the type which traditionally has been performed by seamen. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). It does not matter whether they be called seamen, longshoremen or stevedores so long as the work they are performing is part of the ship's service, and is work traditionally done by seamen. United New York and New Jersey Sandy Hook Pilots Association v. Halecki, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541 (1959).

The evidence shows, and this Court has found, that on the days preceding the accident, the decedents were being supervised in large part by George Mitchell, the engineer for Smith-Rice.

Starting on December 15th, they had begun to dismantle the crane. This work was interrupted on December 13th and was continued on January 4th. On that date, the men were still removing parts of the crane. All five men had been sent aloft. Kole and Carroll affixed the slings of the barge derricks to the tip end of the crane's boom. Morgan, Cooke, and Sipes aided them in dismantling the rigging, lashing the

sheeves, coiling the wires and securing them to the car body. The wires of the topping lift were then put on top of the cab or gantry. The slings of the No. 4 Barge were then attached to the crane's boom near its heel. The boom was then lowered so that it was almost horizontal. The next step would have been for the decedents to manually drive out the heel pins, which would have detached the boom from the cab body. Sipes had been stationed in the cab body. While the remaining four men were walking towards the heel pins, the crane toppled over backwards, causing the deaths of all five men.

Petitioners, relying on Partenweederei, MS Belgrano v. Weigel, 299 F.2d 897 (9th Cir. 1962), cert. denied, 371 U.S. 830, 83 S.Ct. 49, 9 L.Ed.2d 67, contend that the work performed by decedents was "preliminary to, but separate from" the loading of the component parts of the crane onto the barge. 299 F.2d 902. In Belgrano, Weigel's job was driving a tractor on the dock which pushed or pulled railroad cars loaded with lumber up to a point on the track where the lumber could be reached by the ship's loading gear. During the course of this operation, the boom of the ship's loading gear fell and struck him. The District Court found that he was performing the traditional work of seamen and granted recovery, relying on Pope & Talbot, Inc. v. Cordray, 258 F.2d 214 (9th Cir. 1958). In the Cordray case, Cordray was employed by one of two stevedoring companies engaged by the shipowner to discharge cargo from the ship. The first company was under a contract to unload the cargo from the ship's hold to the dock at the side of the ship; the second company, of which Cordray was an employee, was to move the cargo from the side of the ship to a place of rest on the dock. At the time of the accident, Cordray was on board ship coordinating the cargo handling work of the dock longshoremen with that of the longshoremen working on the ship. The Court of Appeals held that under those facts, Cordray was "performing a service for the ship in the discharge of its cargo", and granted recovery.

The District Court in Belgrano apparently found the facts in the two cases to be indistinguishable in that it impliedly held there was no difference in the type of work performed by Weigel and Cordray in relation to the actual loading process. In Weigel's case, the work performed was separate from the actual loading of the vessel; Cordray was involved in work distinct from the actual discharge of cargo, since the cargo had been placed on the dock prior to the performance of Cordray's function. In spite of this apparent similarity in the two cases, the Court of Appeals in Belgrano found that Cordray was not controlling on the facts before it.

It distinguished Cordray on the basis of a stipulation that was entered into by counsel for the shipowner to the effect that the shipowner's contractual obligation was to place the cargo into the warehouse as well as to unload the cargo onto the dock. The Court explained the statement in Cordray to the effect that the warranty of seaworthiness would have extended to Cordray even if he were on the dock as meaning that Cordray would still be performing work in the ship's service because the ship had contracted to do what Cordray was assigned to perform.

In discussing the nature of Weigel's work, the Court stated:

"The libelant was driving a tractor on the dock. His job was to push or pull railroad cars loaded with lumber up to a point on the spur track where the lumber could be reached by the ship's loading gear. He did not participate in loading the lumber onto the vessel or in stowing it. He had nothing to do with the ship's tackle nor did his work require him to perform any service aboard the ship. His work was performed solely on the dock and in an operation preliminary to, but separate from, the work of loading the lumber onto the vessel. Although

libelant's work brought him close enough to the vessel to be injured by the falling boom, liability arises not from the place of injury but from the nature of the work being performed. * * * The burden of proof was upon libelant to show that he was entitled to the protection afforded seamen. In our view, he failed to do so. In so holding, we do not purport to lay down a fixed line of demarcation between 'seamen's work' and 'shoreside work.' Our holding is simply that the libelant failed to meet his burden of proving that the nature of the work performed by him was the 'type of work' traditionally performed by seamen." 299 F.2d at 902.

Relying on *Belgrano*, petitioners contend that decedents were doing work "preliminary" to the actual loading of the component parts of the crane onto the barges. They argue that the work being performed at the time of the accident must be considered in light of the dismantling procedures begun on December 15, 1964. In other words, they urge that the work performed on the day of the accident was part and parcel of the earlier dismantling operations and distinct from the actual loading of the component parts of the crane onto the vessel. The thrust of the argument is that if the accident occurred on December 15th while the decedents were dismantling the crane, the decedents clearly could not be considered as performing traditional seamen's work.

Claimants agree that it is the nature of the work performed rather than the label attached to it which is essential in determining whether the warranty of seaworthiness applies to the decedents. They argue that the work performed by decedents was covered by the PMA–ILWU contract, and hence such work as was performed by decedents was considered by the industry as longshoremen's work. While such work as was performed by decedents may be considered to come under this agreement, a result we do not reach, the agreement is not binding on this Court's duty to inquire into the actual nature of the work performed by decedents. Hence, the inquiry does not end here.

■ We must determine the nature of the work decedents were hired to do, what they had been doing at the precise time of the injury, and the scope of the larger work of which their own activity was a part. Thompson v. Calmar Steamship Corp., 216 F.Supp. 234, 238, (E.D.Pa.1963), *infra*. Claimants urge that the work being performed at the time of the accident was incidental to the loading of the component parts of the crane, and thus within the warranty of seaworthiness. They rely on the principles set forth in Shenker v. United States, 322 F.2d 622 (2d Cir. 1963), and Thompson v. Calmar Steamship Corp., 331 F.2d 657 (3d Cir. 1964), cert. denied, 379 U.S. 913, 85 S.Ct. 259, 13 L.Ed.2d 184.

*Shenker* involved a timekeeper who was injured while on board the ship during an unloading operation. His duties involved keeping payroll records of longshore gangs, keeping records of the various tasks performed and cargo loaded, and so forth. He was required to go on board ship at least twice a day. At the time of the accident, he had been asked by his supervisor to ascertain when the stevedores would quit work, and to find out, he had to go on board the ship. In holding that Shenker was entitled to the protection of the warranty of seaworthiness, the Court stated:

"The keeping of payroll and cargo records plays an important part in the orderly operation of a ship. In carrying out his duty of keeping such records, as well as in carrying out his miscellaneous duties, all of which required, as the district court found, that he be aboard ship frequently, Shenker performed tasks which are a normal and necessary incident to the effective functioning of the ship." 322 F.2d at 627.

The Court also affirmed the District Court's finding that Shenker's work

made him an "integral participant" in the "common maritime undertaking of moving cargo in and out of the vessel."

In Thompson v. Calmar Steamship Corp., the District Court found that libelant, a member of a longshore gang, who, at the time of the accident, was stationed on a gondola car which was being pulled by the ship's gear in order to place it in a position to unload cargo contained therein, was entitled to the warranty of seaworthiness. The Court stated:

"It seems to us that the jury had a right to find that the plaintiff was engaged in the service of the vessel as much as was the member of his gang who operated the winch or the two who fastened the bull line to the three coupled freight cars. It will not do to isolate from the over-all circumstances the fact that the plaintiff happened to be on a loaded freight car and then plead the seemingly strange extravagance that a workman on a freight car is held to be engaged in the traditional work of a seaman. In isolation such a plea may sound appealing. In the circumstances it is unfounded. Plaintiff was not a member of a railroad crew which brought a railroad freight car onto the pier. He was, on the contrary, a member of a longshoremen's gang engaged in loading a vessel, and in the course of doing so it fell to him to participate in an operation on land, but one intimately a part of the use of the ship's equipment, i. e., the bull winch and the bull line." 216 F.Supp. at 238.

This finding was impliedly affirmed on appeal without discussion. Thompson v. Calmar Steamship Corp., 331 F.2d 657 (3rd Cir. 1964).

The District Court in Thompson was aware of Belgrano, supra, but did not choose to distinguish it. We think that there is a clear distinction between the Belgrano situation and that which existed in Thompson. Clearly, the libelant in Belgrano had the single task of working a tractor which pushed or pulled cargo to a point where it could be loaded. He apparently was not a member of the particular longshore gang which actually loaded the cargo on board the vessel. In Thompson, on the other hand, it seems that the libelant was a member of the longshore gang which was in charge of loading the cargo from the gondolas onto the vessel, and hence, would be entitled to the warranty of seaworthiness, although at the time of the accident he happened to be not directly involved in the actual cargo loading operations.

In the instant case, the evidence clearly shows that the decedents were primarily involved in the dismantling of the crane from December 15th to the date of the accident, rather than being involved in cargo loading operations. The crane had not yet become cargo, nor could it become cargo until it was ready to be and in the course of being loaded on the barges in its component parts. Matter of Bauer S. S. Corp., 167 F.Supp. 909 (S.D.N.Y.1957); Matter of North Atlantic and Gulf S. S. Co., 204 F.Supp. 899 (S.D.N.Y.1962), aff'd, Schilling v. A/S D/S Dannebrog, 320 F.2d 628 (2d Cir. 1963). The dismantling of the crane was not in the nature of work traditionally performed by seamen, but was rather work performed by riggers or shoreside workers. The contract between Smith-Rice and Paceco, as later "adopted" by the subcontract between Smith-Rice and Bigge Drayage Company, is not controlling on our determination. The bulk of the contract deals with services to be performed by Smith-Rice, which are non-maritime in nature. Only the first paragraph deals with maritime activities, and within that paragraph, only the transportation of the crane to Paceco's yard deals with work exclusively maritime. It can hardly be said that the work of dismantling the crane is a maritime activity, or work traditionally performed by seamen, although part of it occurred at the foot of the dock near the barges. It is not the locality of the injury which is important, but rather

the type of work being performed at the time of injury which is the measure of the rights of claimants. The *Belgrano, supra.*

While the line that has been drawn between maritime and non-maritime work on these facts may be considered a "thin" one, the Court is of the opinion that the work performed by decedents on the day of the accident must be viewed in the light of the work which had been performed on the crane since December 15th, which was clearly work not involving the loading of cargo onto a vessel. While the work on January 4th would have led to the loading of the crane's parts onto the barges, such work was a *continuation* of the earlier work, and must be considered a part of that work, albeit the last stage in those operations. It necessarily follows that because decedents were not doing the type of work traditionally done by seamen, they were not entitled to any warranty of seaworthiness.

█ Even if such work could be considered as traditional seamen's work, claimants have not shown that the vessel or its gear were unseaworthy in any respects. From all of the evidence, it is abundantly clear that the cause of the accident was, as stated by our findings, the miscalculation of the location of the center of gravity prior to the commencement of any work. The slings or derricks did not fail in any manner so as to cause the accident. Claimant's theory that this equipment was unfit for the intended purpose of holding the crane steady is unfounded because of the fact that the intended purpose of the derricks and slings was to hold the boom in such a manner that the heel pins could easily be removed. In this respect, the equipment did not fail to perform its assigned task.

Claimants' reliance on Thompson v. Calmar Steamship Corp., *supra*, is misplaced for the reason that in *Calmar* an unsafe method of work was employed which utilized the gear of the ship. In the instant case, the method of work was entirely safe, except for the fact that prior to the time any work was begun, an error was made which was the cause of the accident. In other words, liability might be found if the equipment on the barges was used in such a way as to create a risk that the crane might topple over. Thompson v. Calmar Steamship Corp., *supra*. In the *Thompson* case, the vessel's gear was being used in order to bump gondola cars into each other. This method of work, utilizing the ship's gear, created an undue risk that the cars would hit each other so hard as to toss one of the men onto the tracks, as actually did occur in that case. In that sense, the method in which the vessel's gear was being used was unsafe, and that made the vessel unseaworthy. Here, the manner of use of the barge's gear did not create any undue risk that the crane would topple over.

The gear of the barges was being used to keep the boom horizontal and support the weight thereof so that the heel pins could be removed; claimants have not shown that the keeping of the boom at a horizontal level and supporting its weight caused the accident. If such were the case, then perhaps claimants could come under the doctrine of Thompson v. Calmar Steamship Corp. as we have interpreted it. In fact, the pre-existing miscalculation of the center of gravity as set forth in finding No. *22* above was the proximate cause of the accident.

█ Claimants have understandably not placed much emphasis on their Jones Act claims, the likely reason being that the decedents do not come within the provisions of the Act. In order for claimants to recover under the Jones Act, it must be shown that they were seamen and members of the crew of the barges at the time of the accident. Swanson v. Marra Bros., Inc., 328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045 (1946). In other words, decedents must be on board the vessel primarily to aid her in navigation. Puget Sound Freight Lines v. Marshall, 125 F.2d 876 (9th Cir. 1942). From the evidence, it is

clear that the barges had no crews, and decedents could not be seriously considered as aiding the barges in navigation, especially in light of the fact that in many instances the men would be driven by automobile to their place of work rather than ride on the barges. Accordingly, claimants' Jones Act claims are without foundation.

Because of the determination that petitioners are not liable to claimants under the maritime law, we find it unnecessary to reach the issues involving privity and knowledge.

Accordingly, petitioners are entitled to a decree exonerating them from all maritime liability and claims based thereon resulting from the collapse of the crane on January 4, 1965.

Petitioners are to prepare an appropriate decree.