James THOMPSON

v.

CALMAR STEAMSHIP CORPORATION.

Civ. A. No. 26450.

United States District Court
E. D. Pennsylvania.

March 29, 1963.

Avram G. Adler, of Freedman, Landy & Lorry, Philadelphia, Pa., for plaintiff.

Thomas E. Byrne, Jr., of Krusen, Evans & Byrne, Philadelphia, Pa., for defendant.

FREEDMAN, District Judge.

Plaintiff was one of a stevedoring company's gang of longshoremen employed to load shipments of steel aboard the defendant's vessel, lying anchored in navigable waters. The steel was being loaded directly from gondola freight cars in which it had been shipped and which were on the pier. During the evening and early morning hours of December 27–28, 1957 the work of loading had been going on. A number of cars had been unloaded and by approximately 3:30 to 4:00 A.M. there were six cars on the pier. The first in line, Car No. 1, had been unloaded some time before and the longshoremen had just completed the unloading of Car No. 2. It was necessary to move Car No. 2 from its position under the boom of the vessel which was opposite the No. 1 hatch and to bring Car No. 3 into its place. There was no shifting engine available to move the cars. The longshoremen therefore attached the bull line from the No. 3 hatch of the vessel to three loaded cars (Nos. 4, 5 and 6) which were coupled together about 150 to 300 feet away, and by employing the bull winch and utilizing the power of the ship's engines jerked the three loaded cars forward. Using the three cars as a kind of battering ram,

as plaintiff's counsel well described it, they struck Car No. 3, driving it forward so that it would bump Car No. 2 out of its position. It was necessary, of course, to bring Car No. 3 to a stop when it reached the proper position under the boom. For this purpose one longshoreman stood near the track with chocks and another, the plaintiff, was stationed at the brake of Car No. 3.

When the ship's line, drawn by the winch, pulled the three coupled freight cars into motion they struck Car No. 3 with such force that plaintiff was catapulted to the opposite side of the car and fell between it and the platform, on the side away from the vessel. Two of the wheels of Car No. 3 ran over his left leg and amputated it.

Plaintiff brought suit for his injuries, alleging negligence and unseaworthiness. The jury rendered a verdict in his favor in the amount of $118,000. The verdict has been attacked by defendant's post-trial motions now before us.

The basic contention of the defendant, from which stem its detailed arguments on liability, is that situated as plaintiff was at the time of the accident on a pier and, indeed, on a railroad freight car on a pier, the claim is not within the maritime jurisdiction and plaintiff could not possibly be entitled to the warranty of seaworthiness. In effect defendant claims that situs, and not status, controls. We rejected this contention at the trial. It is argued that severe doubt is cast on the correctness of the view we took at the trial by the Supreme Court's denial of certiorari in Partenweederei, MS Belgrano v. Weigel, 299 F. 2d 897 (9th Cir., 1962), cert. den. 371 U.S. 830, 83 S.Ct. 49, 9 L.Ed.2d 67, where a longshoreman driving a tractor on a dock was held not entitled to the warranty of seaworthiness. On the same day the Supreme Court denied certiorari in the Weigel case (October 8, 1962), it granted certiorari in Waterman Steamship Corporation v. Gutierrez, 301 F.2d

415 (1st Cir., 1962), cert. granted 371 U.S. 810, 83 S.Ct. 40, 9 L.Ed.2d 53, where a longshoreman who was on a pier slipped on beans spilled from bags being unloaded from the vessel. The Court of Appeals for the First Circuit had held that in such circumstances the warranty of seaworthiness was inapplicable.

The ultimate decision of the Supreme Court in the Gutierrez case may well prove decisive in the present case. There also is now pending in this Circuit an appeal by a defendant from a decision by our Brother Wood in favor of a longshoreman in Hagans v. Ellerman & Bucknall Steamship Co., 196 F.Supp. 593 (E. D.Pa.1961), involving the same general question. Both these cases have been argued and are now awaiting decision.[1] We deem it desirable to render our judgment without delaying until the decisions in those two cases are announced. It is manifest that there will be an appeal from our decision in any event, and in speeding our action the litigants will be saved delay and yet have the decisions of the Supreme Court and the Court of Appeals available when the appeal in this case comes on to be heard.

Defendant contends that it is inconceivable that one who is working on a pier can be within the scope of the warranty of seaworthiness. It is, however, now well established, albeit the Supreme Court has not yet made it explicit, that the warranty of seaworthiness is not spent merely because a longshoreman, who would be entitled to its protection on board a vessel, happens to be injured on land. The caveat held out in Seas Shipping Co. v. Sieracki, 328 U.S. 85, 100, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), has been submerged by subsequent decisions, beginning with Judge Learned Hand's opinion in Strika v. Netherlands Ministry of Traffic, 185 F. 2d 555 (2d Cir., 1950), cert. den. 341 U. S. 904, 71 S.Ct. 614, 95 L.Ed. 1343. It is the accepted doctrine in our court. Fitzmaurice v. Calmar Steamship Cor-

1. Counsel for the defendant in the Hagans case and in this case, have filed a brief as amici curiae with the Supreme Court in the Gutierrez case.

poration, 198 F.Supp. 304 (E.D.Pa. 1961); Hagans v. Ellerman & Bucknall Steamship Co., 196 F.Supp. 593 (E.D.Pa. 1961), appeal pending; Litwinowicz v. Weyerhaeuser Steamship Co., 179 F. Supp. 812 (E.D.Pa.1959); see also Hagans v. Farrell Lines, 237 F.2d 477 (3d Cir., 1956), where the application of the warranty of seaworthiness appears to have been assumed. In Hagans v. Ellerman & Bucknall Steamship Co., supra, our Brother Wood held that the warranty of seaworthiness applied to a longshoreman who was engaged in unloading bags of sand from a flat truck and piling them on the pier after they had been moved about 100 feet past a door in the side of the pier building which abutted the apron. The bags had been unloaded from defendant's vessel by other members of the stevedore gang. In the Litwinowicz case plaintiffs, longshoremen, were injured while loading steel from a gondola freight car on tracks on the pier beside the vessel, as in our case. Plaintiffs were working on the railroad car when they were injured when a "Baltimore dog" separated and the steel fell back into the railroad car, pinning the plaintiffs against the inside of the car. Our Brother Kraft held that the warranty of seaworthiness extended to the plaintiffs even though they were injured on the pier, and, indeed, as in the present case, while on a freight car. The Court of Appeals for the First Circuit in the Gutierrez case disagreed with the decisions of our court in the Hagans and Fitzmaurice cases. We are not bound by the decision in the Gutierrez case and, free as we are to consider it on its merits, we prefer not to follow it.

The defendant argues that the doctrine of the Sieracki case that "Historically the work of loading and unloading is the work of the ship's service, performed until recent times by members of the crew",[2] is founded on an erroneous conception of maritime history. For this purpose defendant proferred the evidence of a witness, Leighton Shields, as an expert in maritime history. It offered to prove by him the historical development of the practice of loading and unloading cargoes and to show from this history that such work was traditionally done, not by the ship's crew, but by longshoremen. Indeed, the offer went on to establish, by going back into early European history and even into ancient times, that the handling of cargo was not permitted to a ship's crew but was required to be done by local workers. From this defendant offered to argue to the jury that it should find as a fact that the plaintiff, working on a pier, loading cargo on to a vessel, was not engaged in the traditional work of a seaman.

This offer may be viewed in a number of aspects. It might be deemed to have tendered factual evidence to overcome a prima facie presumption of historical fact stated by the Supreme Court in the Sieracki case. It might be viewed as evidence offered by an expert to inform the court of what should be judicially noticed as historical truth, contrary to the statement of the Supreme Court in the Sieracki case. It might be viewed as factual evidence which in the absence of contradicting evidence from the plaintiff would be submitted to the jury as unchallenged although still requiring the jury's finding. We consider all these possibilities unacceptable because we regard the question as settled by the Sieracki case. As we view it the Court there laid down a guiding rule which it is our duty to apply. Individual juries may not be permitted to arrive at individual and perhaps contradictory conclusions as to what is within the traditional work of seamen after the Supreme Court has flatly announced the historical fact. See also Litwinowicz v. Weyerhaeuser Steamship Company, 179 F.Supp. 812, 818 (E.D.Pa.1959).

We instructed the jury that a longshoreman is entitled to the benefit of the warranty of seaworthiness even though he is employed immediately by someone other than the shipowner if at the time

2. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 96, 66 S.Ct. 872, 878, 90 L.Ed. 1099 (1946).

he is engaged in the service of the vessel, and that this is true whether he is working aboard the vessel or on the pier. (N.T. 1243). In determining whether he was at the time engaged in the service of the vessel the jury was charged that they should consider the work he was hired to do, what he had been doing immediately prior to the accident, what he was doing at the precise time of his injury, and what was the scope of the larger work of which his own activity was a part.[3] It is true that plaintiff was on the pier, in fact on a railroad freight car, at the time of the accident. He was not there, however, as a railroad brakeman, but as a longshoreman. All of the longshoremen were part of a team engaged in loading the vessel. Some happened to be on board, one at the winch, making use of the ship's engines, its winch and line, and two dragging the line from the vessel and attaching it to the three coupled, steel-loaded freight cars which were to be used as a battering ram. One was on the pier in position to put a chock under Car No. 2 after it had been bumped away from the boom. Another had to stop Car No. 3 after it had been struck by the coupled cars. That one was the plaintiff.

It seems to us that the jury had a right to find that the plaintiff was engaged in the service of the vessel as much as was the member of his gang who operated the winch or the two who fastened the bull line to the three coupled freight cars. It will not do to isolate from the over-all circumstances the fact that the plaintiff happened to be on a loaded freight car and then plead the seemingly strange extravagance that a workman on a freight car is held to be engaged in the traditional work of a seaman. In isolation such a plea may sound appealing. In the circumstances it is unfounded. Plaintiff was not a member of a railroad crew which brought a railroad freight car on to the pier. He was, on the contrary, a member of a longshoremen's gang engaged in loading a vessel, and in the course of doing so it fell to him to participate in an operation on land, but one intimately a part of the use of the ship's equipment, i. e. the bull winch and the bull line.

We hold, therefore, that the jury's verdict, which found in effect that plaintiff was engaged in the service of the vessel at the time of his injury, was fully justified by the evidence.

The facts which we have already described also dispose of the contention that plaintiff's injury was not caused by any unseaworthiness of the vessel. What occasioned the accident and brought the warranty of seaworthiness into operation was not the plaintiff's position on a freight car on a pier. It was rather the additional element of the use of the vessel's equipment and the physical attachment of the ship's line to the three loaded freight cars so as to

---

3. "In determining whether the plaintiff was engaged in the service of the vessel, you should consider the work that he was hired to do, what he had been doing immediately prior to the accident, what he was engaged in doing at the precise time that he was injured and whether what he was then doing at that precise time was part of a larger whole of activity and what that larger activity was.

"For example, to illustrate what I mean by that, what work had he been doing on Car No. 2 apparently just a short time before the accident happened? Had he helped to load cargo from Car No. 2 to the vessel? What was the work that he was undertaking to do on Car No. 3? And what was the over-all work of which this was a part? All of these and other aspects of that part of the case which will come to your minds as you review the evidence, you must consider in order to determine whether the plaintiff, at the time he was injured, was engaged in the service of the vessel, as I have tried to describe it to you.

"If you find from all the evidence, in the light of all the surrounding circumstances, that the plaintiff at the time of the accident was engaged in the service of the vessel, whether he was on land at the time, whether he was aboard the vessel at the time, or whether he was on a railroad car at the time, in any such event the warranty of seaworthiness would be applicable to him." (N.T. 1243–1244.)

make them the hammerhead to strike Car No. 3 into position by the application of the steam power of the ship's engines and the tightening of the line by the bull winch. A longshoreman injured by a defective ship's line cast from the vessel to the pier surely may be said to have been injured by unseaworthy ship's gear. Equally so would unseaworthiness exist if the ship's defective gear caused his injury by the fall of cargo which in itself was harmless. Here the otherwise harmless freight cars became animated by the power of the ship's engines and the physical connection of the ship's line. There is no insulation of unseaworthiness of the ship's line and its attachments merely because the attachments were not in themselves defective if used in some other manner.

We therefore reject defendant's contention that the vessel's appurtenances which had to be seaworthy could include only, at the most, the bull winch and the bull line but not the loaded freight cars to which the line was attached. We left it to the jury to determine under all the circumstances whether the use of these three heavy freight cars loaded with steel, attached to the ship's line and moved by the ship's winch under the power of the ship's engines made them all one and therefore made the ship's use of them an unseaworthy appurtenance to the vessel. If this was not a reasonably safe line, with an enormously heavy battering ram at its end, then plaintiff standing on Car No. 3, prepared to brake it after it had been struck, was injured as a result of the ship's use of an unsafe and, indeed, highly dangerous ship's appliance or appurtenance.

As we view the case, therefore, it is unnecessary to look to the provisions of the Act for the Extension of Admiralty Jurisdiction, 46 U.S.C.A. § 740. If there were any question of the applicability of maritime law to the present case, the statute is enough to put it to rest. For it expressly provides that the admiralty and maritime jurisdiction shall "extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land." The injury here was "caused by a vessel". See Hovland v. Fearnley & Eger, 110 F.Supp. 657 (E.D.Pa.1952), Kirkpatrick, Ch.J. Maritime law therefore applies, in the language of the Act, "notwithstanding that such damage or injury [was] * * * done or consummated on land". The provision may not be read, as defendant implies, in such a way as to limit it to property damage. It is expressly made applicable to personal injury caused by a vessel but done or consummated on land. The legislative history to which defendant refers (U.S.Code Congressional Service (1948), p. 1898. See Fematt v. City of Los Angeles, 196 F.Supp. 89 (S. D.Cal.1961).) is not in conflict with the plain language of the Act.

On the negligence aspect of the case defendant contends that the charge was erroneous because the jury was permitted to find the defendant negligent if it failed to furnish the plaintiff a safe place to work. (N.T. 1248). It is said that this placed on the defendant the burden of exercising care in an area—the pier—which it had neither the ability nor the right to control. Plaintiff urges that defendant in fact did have sufficient control over the pier to be held liable for any unsafe condition on it. In our view the jury was justified in finding that defendant failed to provide a safe place for the plaintiff to work, not because of any control over the pier itself, but rather because it ordered him to stand on a freight car which it then struck with the great force of three other loaded freight cars propelled by the ship's line and engines. Even if plaintiff had not been ordered to stand on the freight car, prepared to apply the brakes, at the very least the place where he was working was made unsafe for him when it was struck by the three loaded freight cars. This negligence the jury had a right to attribute to the defendant because the evidence showed

that the night mate was in charge of the vessel during the loading operation, after the chief mate had gone off duty.

■ Complaint is made that we excluded the testimony of one Hedemann (N.T. 1042–1059). The evidence was excluded on plaintiff's plea of surprise. This plea was justified. Judge Kraft's pretrial order gave the defendant leave to amend its pretrial memorandum by adding the names of its *experts*, with immediate notice to all counsel. Pursuant to that order defendant filed a supplemental pretrial memorandum in which Hedemann was for the first time designated as a witness. This clearly implied that he was an expert witness. Any other view would require an assumption that defendant intended to violate Judge Kraft's order. At the trial five months later defendant called Hedemann, not as an expert but as a factual witness to testify to the physical circumstances immediately after the accident and especially to a res gestae utterance of an unidentified longshoreman. Hedemann was not referred to in any of the answers to interrogatories although if he were a factual witness a number of interrogatories would have required that he be identified.

■ The objection was well taken for another reason. The claimed res gestae version of the accident is contrary to the admission in the defendant's pretrial memorandum. Under our Rules such a factual dispute must have been specified in the pretrial memorandum. This was not done. Moreover, the defendant's answer to plaintiff's interrogatory No. 1 (a) alleged that "defendant has information that plaintiff was injured when he fell from a railroad car and was run over by that car or another". Thus plaintiff had every right to rest on the assurance that defendant would make no claim that he fell from the adjoining platform rather than from a railroad car.

■ A judicial proceeding is a reasoned effort to ascertain the truth. The rejection of the evidence of a witness is therefore always difficult. Inevitably the court is called upon to balance the desirability of having all possible evidence made available at the trial, against the need to maintain a system of orderly procedure for preparation and trial. The witness was an employee of a subsidiary of the same parent corporation as is the defendant. He was on duty on the pier at the time of the accident. The pier and the vessel were visited a day after the accident by the defendant's counsel and a court reporter, who took the statements of a number of witnesses, including members of the crew and of the stevedore gang. The nondisclosure of the existence of the witness, an employee of a related corporation who worked at the pier, would be difficult to explain in any circumstances. Yet the only excuse offered by the defendant is that it was uncertain that the witness would be available at the time of trial. In these circumstances it would be wholly contrary to the spirit of our Rules and destructive of orderly procedure to have permitted him to testify.

■ Complaint is also made regarding the admission of the evidence of two of the plaintiff's witnesses, Rehnert and Stang. Rehnert's testimony dealt with the mechanism of the freight car. It sought to explain why the plaintiff, who alleged that he was on the right-hand side of the car at the brake, nevertheless ultimately fell under the opposite side of the car. Stang was called as an expert. His evidence was properly admissible because it showed how dangerous was the use of the three loaded freight cars as a battering ram and how easy it would have been to adopt any one of a number of other reasonably safe methods.

■ Lastly, defendant complains that the verdict is excessive. Plaintiff suffered a terrible injury. He was dazed but conscious when the freight car amputated his leg. He had to undergo two operations in the hospital, where he was confined for 116 days. The treatment of the amputation was far from satisfactory. The stump is still raw and irritated, five years after the accident.

His difficulty in walking was obvious in the courtroom. A medical expert testified that another operation is necessary for the removal of his kneecap.

Shortly before the accident plaintiff had gone back to the water front in order to obtain the higher wages of a longshoreman. Since the accident he has been unable, of course, to engage in the hazardous work of a longshoreman. He returned to the work that he had previously known—laying hardwood floors. This is extremely difficult for him to do since the accident. His son testified that he can only do a limited part of the work, such as nailing down the floor and even here his ability to work has been severely curtailed. His earnings since the accident have been trivial.

It was for the jury to determine what his earnings would have been from the date of the accident to the time of trial. This was a controversial question because he had only gone back to the water front a short time before the accident. Similar controversy surrounded the question of the amount of his earnings during the remainder of his working life. He was 53 years of age at the time of trial with a life expectancy of 20½ years. If he would work until the age of 65 he would have 12 years of future earning capacity. There was evidence which would have justified the jury in finding that shortly after the accident he would have had assured steady employment as a longshoreman. There was also evidence of the earnings of other longshoremen at the increased hourly rates of pay since the time of the accident. Defendant challenged the evidence of assured future employment and plaintiff's claim that his earning capacity should be compared to that of the longshoreman whose earnings were offered in evidence. In the circumstances of this case the past and future impairment of earning capacity was peculiarly for the jury for it depended heavily on the credibility of the evidence.

In any event, whatever variation may fairly be said to exist between the competing versions of fair compensation to the plaintiff for past and future impairment of earning capacity, there can be no doubt that the pain, humiliation, disfigurement and impairment in ability to walk which plaintiff has already suffered and will endure throughout the remainder of his life is so serious that, when added to the most limited award for past and future impairment of earning capacity, the verdict still would be fully justified.

In these circumstances we cannot say that the verdict is so shockingly excessive that in the interest of justice it ought to be set aside or reduced.

### ORDER

And now, March 29, 1963, the motion of defendant, Calmar Steamship Corporation, for judgment notwithstanding the verdict or for a new trial or for a remittitur, is denied.