James **THOMPSON**

v.

**CALMAR STEAMSHIP CORPORATION,**
Appellant.

**No. 14410.**

United States Court of Appeals
Third Circuit.

Argued Oct. 24, 1963.

Decided April 15, 1964.

Rehearing Denied May 20, 1964.

T. E. Byrne, Jr., Philadelphia, Pa. (Mark D. Alspach, Krusen, Evans & Byrne, Philadelphia, Pa., on the brief), for appellant.

Avram G. Adler, Philadelphia, Pa. (Abraham E. Freedman, Freedman, Landy & Lorry, Philadelphia, Pa., on the brief), for appellee.

Before STALEY and GANEY, Circuit Judges, and NEALON, District Judge.

NEALON, District Judge.

Plaintiff, James Thompson, brought suit against defendant, Calmar Steamship Corporation, seeking to recover damages for injuries allegedly sustained as a result of defendant's negligence and for breach of the warranty of seaworthiness under the principles of maritime law. The jury having returned a verdict for plaintiff in the amount of $118,000.00, defendant has filed this appeal.

The relevant facts are well summarized in the opinion of the Court below, as follows:

"Plaintiff was one of a stevedoring company's gang of longshoremen employed to load shipments of steel aboard the defendant's vessel, lying anchored in navigable waters. The steel was being loaded directly from gondola freight cars in which it had been shipped and which were on the pier. During the evening and early morning hours of December 27–28, 1957, the work of loading had been going on. A number of cars had been unloaded and by approximately 3:30 to 4:00 A.M., there were six cars on the pier. The first in line, Car No. 1, had been unloaded some time before and the longshoremen had just completed the unloading of Car No. 2. It was necessary to move Car No. 2 from its position under the boom of the vessel which was opposite the No. 1 hatch and to bring Car No. 3 into its place. There was no shifting engine available to move the cars. The longshoremen therefore attached the bull line from the No. 3 hatch of the vessel to three loaded cars (Nos. 4, 5, and 6) which were coupled together about 150 to 300 feet away, and by employing the bull winch and utilizing the power of the ship's engines jerked the three loaded cars forward. Using the three cars as a kind of battering ram, as plaintiff's counsel well described it, they struck Car No. 3, driving it forward so that it would bump Car No. 2 out of its position. It was necessary, of course, to bring Car No. 3 to a stop when it reached the proper position under the boom. For this purpose one longshoreman stood near the track with chocks and another, the plaintiff, was stationed at the brake of Car No. 3.

"When the ship's line, drawn by the winch, pulled the three coupled freight cars into motion they struck Car No. 3 with such force that plaintiff was catapulted to the opposite

side of the car and fell between it and the platform, on the side away from the vessel. Two of the wheels of Car No. 3 ran over his left leg and amputated it."

Before considering the arguments of appellant, certain basic propositions must be established. It is elementary that the owner of a ship is liable to indemnify a seaman for an injury caused by the unseaworthiness of the vessel or its appurtenant appliances and equipment and it has been settled law in this Country ever since The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903). There can be no dispute also, that longshoremen, engaged in the service of the ship, are entitled to the same protection against unseaworthiness which members of the ship's crew would enjoy. Seas Shipping Company v. Sieracki, 328 U.S. 85, 66 S. Ct. 872, 90 L.Ed. 1099 (1946). McKnight v. N. M. Paterson & Sons, Ltd., 286 F.2d 250 (6th Cir. 1960). The work of loading and unloading the ship is, as a matter of law, the work of the ship's service, performed until recent times by members of the crew. Hagans v. Ellerman & Bucknall Steamship Company, 318 F.2d 563 (3d Cir. 1963). The shipowner cannot escape liability by the simple means of delegating the loading function to an independent contractor. " * * * [t]hat the owner seeks to have it done with the advantages of more modern divisions of labor does not minimize the worker's hazard and should not nullify his protection." Seas Shipping Company v. Sieracki (supra). Further, the unseaworthiness of a vessel or its equipment may arise from acts of the longshoremen crew or, indeed, of the injured longshoreman himself. Grillea v. United States, 232 F.2d 919 (2d Cir. 1956); Knox v. United States Lines Company, 294 F.2d 354 (3d Cir. 1961); Smith v. Lauritzen, 201 F.Supp. 663 (E.D.Pa.1962).

If the longshoreman is actually engaged in the service of the ship, it is immaterial whether the accident caused by the vessel's unseaworthiness occurs away from the ship on the pier. Gutierrez v. Waterman Steamship Corporation, 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963). As Mr. Justice White observed in Gutierrez:

"Respondent contends that it is not liable, at least in admiralty, because the impact of its alleged lack of care or unseaworthiness was felt on the pier rather than aboard ship. Whatever validity this proposition may have had until 1948, the passage of Extension of Admiralty Jurisdiction Act, 62 Stat. 496, 46 USC § 740, swept it away when it made vessels on navigable water liable for damage or injury 'notwithstanding that such damage or injury be done or consummated on land.' Respondent and the carrier amici curiae would have the statute limited to injuries actually caused by the physical agency of the vessel or a particular part of it— such as when the ship rams a bridge or when its defective winch drops some cargo onto a longshoreman. Cf. Strika v. Netherlands Ministry of Traffic, 185 F.2d 555 (C.A.2d Cir.); Hagans v. Farrell Lines [Inc.], 237 F.2d 477 (C.A.3rd Cir.). Nothing in the legislative history supports so restrictive an interpretation of the statutory language."

The shipowner's actual or constructive knowledge of the unseaworthy condition is not essential to his liability, and this is true whether the unseaworthy condition be of a permanent or merely a temporary nature. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); Alaska Steamship Co., Inc. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954). "A vessel's unseaworthiness might arise from any number of individualized circumstances. Her gear might be defective, her appurtenances in disrepair, her crew unfit. *The method of loading her cargo,* or the manner of its storage might be improper." (emphasis supplied) Morales v. City of Galveston, 370 U.S. 165, 82 S. Ct. 1226, 8 L.Ed.2d 412 (1962).

Here we are faced with a highly questionable loading procedure. Plaintiff was a member of a longshoremen's gang en-

gaged in loading a vessel, and in the course of doing so it fell to him to participate in an operation on land, but one intimately associated with the use of the ship's equipment, i. e., the bull winch and the bull line. As Judge Freedman so aptly stated in his opinion in the District Court:

"What occasioned the accident and brought the warranty of seaworthiness into operation was not the plaintiff's position on a freight car on a pier. It was rather the additional element of the use of the vessel's equipment and the physical attachment of the ship's line to the three loaded freight cars so as to make them the hammerhead to strike Car No. 3 into position by the application of the steam power of the ship's engines and the tightening of the line by the bull winch. A longshoreman injured by a defective ship's line cast from the vessel to the pier surely may be said to have been injured by unseaworthy ship's gear. Equally so would unseaworthiness exist if the ship's defective gear caused his injury by the fall of cargo which in itself was harmless. Here the otherwise harmless freight cars became animated by the power of the ship's engines and the physical connection of the ship's line. There is no insulation of unseaworthiness of the ship's line and its attachments merely because the attachments were not in themselves defective if used in some other manner." Thompson v. Calmar Steamship Company, 216 F.Supp. 234 (E. D.Pa.1963).

In Robillard v. A. L. Burbank & Co., Ltd., 186 F.Supp. 193 (S.D.N.Y.1960) (cited with approval in Gutierrez), the longshoremen crew used the vessel's winches, which the Court found were operating properly, to unload lumber from the vessel. The lumber was being unloaded from the center of the deck at first and the Second Mate was dissatisfied with this procedure and so informed the stevedores inasmuch as he feared that the heavy loads passing over the remainder of the cargo on the side of the deck might "knock it off the dock." He remonstrated with the stevedores, but they continued their operation, and while one of the loads passed over the side it dislodged several pieces of the stacked lumber which fell over and hit plaintiff longshoreman, who was working on the dock. Circuit Judge Friendly, sitting by designation, citing Mitchell, Petterson, and Grillea, held that the unsafe method of unloading the lumber rendered the equipment unseaworthy.

In Strika v. Netherlands Ministry of Traffic, 185 F.2d 555 (2d Cir. 1950), the longshoremen crew was attempting to lift a heavy metal "pontoon" from the dock by fastening it with two "bridles" to the ship's winches, booms and falls. The pontoon fell and struck a longshoreman who was assisting in the operation. According to the Court's opinion:

"Each 'bridle' consisted of two lengths of wire cable, each length having a hook at one end, and the other end being fastened to a single common ring. Each hook was passed into a 'slot' at one corner of the 'pontoon,' and the common ring was passed into the hook at the end of the fall. In this way each 'bridle' could lift the 'pontoon' at two of its corners, and two 'bridles' could lift it at all four corners. Instead of making the two rings fast to each other, so as in effect to make a single 'bridle' with four lengths of wire, the rings were left separate on the hook; and in consequence, after the winch had lifted the 'pontoon' a short distance from the dock, it tilted, the two rings separated and one of them slipped out of the hook, dropping one end of the 'pontoon.' "

The Court held that the use of the two "bridles" instead of one was unsuitable for the purpose, and made the ship's gear pro tanto unseaworthy. If the use of two bridles instead of one was unsuitable for the purpose of raising the "pontoon" into place, then certainly while loading the defendant's cargo, the dangerous

method of bumping gondola cars into position under the hammer as utilized in this case was unsuitable for that purpose.

■ Moreover, the jury heard the testimony of expert witnesses in the case and had the opportunity of hearing Mr. John Stange, a longshoreman and supervisor of longshoremen for more than forty-five years. He was asked, "Do you have an opinion as to the reasonable safety of using three loaded cars to bump or push No. 3 car under the hammer?" He answered, "Yes * * * well, the three cars shouldn't hit the one car that is one thing * * * Because they are too heavy, and they gain more weight in momentum, and when they hit the Car No. 3, which was loaded with plate, why it is like hitting a brick wall." He then, in answer to a question, enumerated four different methods or devices "other than using the ship's gear which can safely and adequately move railroad cars into the carspotting position." With this testimony before it the jury could and did properly find, from the facts, that the method used to load the ship's cargo created an undue risk to those called upon to load it, making the vessel unseaworthy, and that the unseaworthiness was the cause of Thompson's injury. See Hagans v. Ellerman & Bucknall Steamship Company (supra).

■ As to the negligence phase of the case, the jury was justified in returning a verdict in favor of the plaintiff on the theory that the defendant was negligent in not furnishing plaintiff with a safe place to work.

■ The defendant contends that it had no control over the pier and thus could not be responsible for an injury occurring thereon. In Gutierrez (supra), The United States Supreme Court refused to find that any failure to control the pier would exculpate the vessel owner from his non-delegable duty to furnish longshoremen working in the service of his vessel a safe place to work. The Court went on to say: "The man who drops a barrel out of his loft need not

control the sidewalk to be liable to the pedestrian when the barrel hits." Defendant allowed the cargo to be loaded in a dangerous and defective manner. The night mate was in charge of the vessel and witnessed the operation resulting in this accident. "The shipowner has a duty not to permit its ship's unloading activities, which can affect people on the pier, to be carried on in a way that subjects those people in the area of these activities to an unreasonable risk or harm." Fisher v. United States Lines Company, 198 F.Supp. 815 (E.D.Pa. 1961). In Beard v. Ellerman Lines, Ltd., 289 F.2d 201 (3d Cir. 1961), this Court pointed out that "It is settled law that Ellerman owed to Beard the obligation to provide him with a safe place to work, and its failure to do so constituted negligence. It is equally settled that Ellerman was under a duty to use methods which complied with the standard of reasonable care in the discharge of its cargo, and to forbid the use of a discharge method by the stevedore of its selection which did not conform to a standard of reasonable care." The standard of reasonable care required in discharging the cargo also applies with equal force to the loading of the cargo. Defendant had an absolute and non-delegable duty of care toward the plaintiff not to create this risk to him, which it failed to meet. When this lack of care culminated in plaintiff's injury, defendant became legally liable to compensate him for the harm. See Gutierrez v. Waterman Steamship Corporation (supra).

■ The defendant further complains that the trial court erred in rejecting the testimony of witnesses Shields and Hedemann. The purpose of Shields' testimony was to attempt to show that the work being done by plaintiff was not work which had been performed traditionally by the ship's crew. That the work inextricably associated with the loading of the vessel is, as a matter of law, the work of the ship's service, was clearly established in Hagans (supra), and recently confirmed in Gutierrez (supra). Consequently, the testimony of

Shields would do no more than confuse the jury and was properly excluded. As to the witness Hedemann, a pre-trial order gave the defendant leave to amend its pre-trial memorandum by adding the names of expert witnesses. The defendant filed a supplemental pre-trial memorandum designating Hedemann as a witness. This clearly implied that he was to be an expert witness. At the trial of the case he was called as a factual witness, purportedly to testify that he arrived at the scene of the accident immediately after it happened and when he asked what had happened he was told by one of the longshoremen that Thompson slipped off the platform while trying to apply the brake and that the ship's gear was not involved. Plaintiff's plea of surprise was well taken. The witness was an employee of a subsidiary of the same parent corporation as is the defendant and was on duty at the time of the accident. The very next day the scene was visited by appellant's counsel and a court reporter who took statements from a number of witnesses, including members of the crew and the stevedore gang. Hedemann was not referred to in any of the answers to interrogatories, although if he were a factual witness, a number of interrogatories would have required that he be identified. The opinion of the District Court adequately handles the question and is, in part, adopted here:

"Under our Rules such a factual dispute must have been specified in the pretrial memorandum. This was not done. Moreover, the defendant's answer to plaintiff's interrogatory No. 1(a) alleged that 'defendant has information that plaintiff was injured when he fell from a railroad car and was run over by that car or another'. Thus plaintiff had every right to rest on the assurance that defendant would make no claim that he fell from the adjoining platform rather than from a railroad car.

"A judicial proceeding is a reasoned effort to ascertain the truth. The rejection of the evidence of a witness is therefore always difficult. Inevitably the court is called upon to balance the desirability of having all possible evidence made available at the trial, against the need to maintain a system of orderly procedure for preparation and trial. * * * the only excuse offered by the defendant is that it was uncertain that the witness would be available at the time of trial. In these circumstances it would be wholly contrary to the spirit of our Rules and destructive of orderly procedure to have permitted him to testify."

■■■ Defendant also asserts that the verdict was excessive. At the time of the trial Mr. Thompson was fifty-three years of age. He had a life expectancy of twenty and one-half years. If he worked until he was sixty-five, he would have twelve years of future earning power. There was evidence introduced, which the jury had every right to and obviously did believe, that plaintiff was, shortly after the accident, to receive steady employment as a longshoreman. Also in evidence were the earnings of fellow longshoremen and the increased hourly rates since the time of the accident. That his earning capacity has been seriously impaired cannot be questioned. When one considers further his disfigurement, impairment in ability to walk, and pain, suffering, and inconvenience, the award cannot be said to be so shockingly excessive that the interests of justice cry out that it be set aside or reduced.

The appellant speaks of other "cumulative errors" in the case, but after a thorough review of the record and a careful weighing of the arguments of the parties, we perceive none.

Consequently, the judgment of the District Court will be affirmed.

## ON PETITION FOR REHEARING

Before BIGGS, Chief Judge, McLAUGHLIN, KALODNER, STALEY, HASTIE, GANEY and SMITH, Circuit Judges, and NEALON, District Judge.

PER CURIAM.

The petition for rehearing will be denied.

HASTIE, Circuit Judge, with whom WILLIAM F. SMITH, Circuit Judge, joins (dissenting).

Under this decision "unseaworthiness" becomes a liability-imposing word without rational meaning or conceptual scope.

Heretofore, to me at least, unseaworthiness has signified some unfit, unsound or unsafe condition of a vessel or its gear or equipment. A vessel may be unseaworthy because of a structural defect, or because it is improperly manned or because its equipment is defective or inadequate in some way. But, as I understand the facts in this case, the vessel and its gear were not defective in any way. The winch and cable, part of the ship's gear, involved in this accident, were sound and worked perfectly. The trouble was that stevedores, not in the employ of the ship, negligently undertook to move one railroad car from its unloading position on the pier alongside the ship by bumping it with a train of oncoming cars. They used the ship's winch and cable to put the bumping cars in motion. This procedure may well have been active negligence by the stevedores, but it involved no structural or operational defect of the gear, and no unfitness to move cargo carrying cars. If a ship is to be liable for any negligence of a stevedore or any other third person in misusing its gear, I think the court should say so and should offer some justification other than an anomalous characterization of the gear as unseaworthy.

I think the Supreme Court has never supported a finding of unseaworthiness which could not be rationalized as involving some structural or functional unfitness of vessel or gear for its intended use. If any decision of an inferior court goes as far as this one, we certainly are not obligated to follow it.

Unable to find any satisfactory rationalization for this decision or to comprehend its scope, I fear that the bar and the maritime community will find that our ruling leaves confused and doubtful the question of the ship's liability in many situations, in which it heretofore has seemed clear that no liability existed. Does this decision mean that when a pilot negligently maneuvers a ship against a bridge or a pier, the steering apparatus is unseaworthy? If a stevedore negligently allows tackle to fall to the deck injuring someone, is the gear unseaworthy? If one passenger injures another by carelessly using some sports equipment supplied by the ship, is this equipment unseaworthy? If it seems rdiculous to apply the concept of unseaworthiness to such cases as these, I think the incongruity lies not with the choice of examples but with the present decision which seems to embrace all such situations.

In my judgment, there should be a rehearing of this appeal before the court en banc to permit full consideration whether we wish to make this puzzling extension of liability without fault and, if so, to provide a rationalization of our ruling and some definition of its scope.