**Mario TARABOCCHIA, Plaintiff,**

v.

**ZIM ISRAEL NAVIGATION CO., Ltd., Defendant and Third-Party Plaintiff,**

v.

**JOHN W. McGRATH CORP., Third-Party Defendant.**

**No. 64 Civ. 3604.**

United States District Court
S. D. New York,
Civil Division.

Feb. 6, 1969.

Kenneth Heller, New York City, for plaintiff.

Hill, Betts, Yamaoka, Freehill & Longcope, New York City, Thomas H. Healey, New York City, of counsel, for defendant and third-party plaintiff.

Joseph F. McGoldrick and McHugh & Leonard, New York City, Martin J. McHugh, New York City, of counsel, for third-party defendant.

LASKER, District Judge.

Plaintiff longshoreman brings this action to recover damages for personal injuries sustained by him on October 28, 1964, resulting from the alleged negligence and unseaworthiness of the SS. BEERSHEVA. Defendant ZIM ISRAEL NAVIGATION CO., LTD. (hereinafter Zim Israel), the owner and operator of the vessel on the day in question, has impleaded stevedore JOHN W. McGRATH CORP. (hereinafter McGrath), plaintiff's employer and stevedore for Zim Israel. Zim Israel denies liability under the negligence and unseaworthiness theories; McGrath, while also arguing against plaintiff's recovery, does not contest its obligation to indemnify Zim Israel if the latter is liable to plaintiff.

· On October 28, 1964, plaintiff was engaged as a dockman by McGrath in the unloading of cargo from Hatch No. 2 of the SS. BEERSHEVA which was docked at Pier 32, North River, New York. Throughout the unloading operations, plaintiff was standing on a skid, or temporary landing platform, which extended from the loft or second story of Pier 32, North River, opposite Hatch No. 2 of the SS. BEERSHEVA. Plaintiff and a co-worker, Morin, were to disengage the slings from drafts of plywood after these drafts were landed on the skid by the ship's winches and boom apparatus.

The accident occurred between 2:00 and 2:30 P.M. on the day in question. After the draft of plywood came to rest on the skid, the plaintiff and Morin each removed one of the slings from the draft. Since the sling is a piece of wire cable with a loop at both ends, it could be removed from the draft by detaching one loop from the cargo hook while leaving the other loop in place. Although there was testimony to the effect that sliding the entire sling out from underneath the draft, without removing either loop, is the preferred procedure, this method was not employed.

As the plaintiff and Morin each held the unfastened loop end of one of the slings, the winch operator commenced to take in the cargo runners and cargo slings. It is unclear as to whether Morin dropped his loop to the floor of the skid following the upward thrust of the winch or previous to that exertion of the upward force. As will become clear later, however, an exact determination on this issue is not crucial. After Morin's loop hit the floor of the skid it appears to have dropped into a crack of approxi-

mately two to three inches between the skid and the pier loft. The most plausible explanation for what actually caused the accident is that Morin's loop, after having entered the crack, rotated in such a manner that when pulled upward by the winch it could not exit smoothly through the crack. Accordingly, the upward pull of the winch on the loop caused it to dislodge the skid from the pier loft. As a result of the dislodging of the skid, the plaintiff was precipitated to the concrete stringpiece or apron on the ground level of the pier, some twenty feet below. Plaintiff sustained fractures of the left ankle and facial bones, and was taken to Beekman Downtown Hospital for emergency treatment.

## I.

■■■ The basis of plaintiff's claim is that the BEERSHEVA was unseaworthy in that the skid and the unloading slings were not reasonably fit for their intended service. It is well established by now that the warranty of a seaworthy vessel extends from the shipowner to longshoremen as well as to crewmen, if the longshoreman is performing the type of work traditionally done by seamen. Seas Shipping Co., Inc. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). A longshoreman injured on the dock can recover for the unseaworthiness of the vessel where his injury was caused by an unseaworthy condition of the vessel. Gutierrez v. Waterman S.S. Corp., 371 U.S. 810, 83 S.Ct. 40, 9 L.Ed. 2d 53 (1963); Robillard v. A. L. Burbank & Co., Ltd., 186 F.Supp. 193 (S.D. N.Y., 1960). However, where it is alleged that unseaworthiness was caused by a mechanism not literally a part of the ship, the mechanism must be shown to have been an "appurtenance" of the ship. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960).

The skid here was not an appurtenance of the SS. BEERSHEVA. In Fredericks v. American Export Lines, 227 F.2d 450 (2d Cir., 1955), the Court of Appeals held that a skid, similar to the one before this court, was not a part of the ship, and thus not subject to the duty of seaworthiness. It should be noted that Judge Medina considered the fact that the skid played an essential role in the unloading process, but this was not considered controlling. Eight years later, the Court of Appeals considered again the question of what constitutes an appurtenance to a ship such as to render the ship subject to a claim of unseaworthiness. In Forkin v. Furness Withy & Co., 323 F.2d 638, 641 (2d Cir., 1963), Judge Friendly stated:

"Equipment maintained on a pier to establish connection with a ship is not an 'appliance appurtenant to the ship' or part of the ship's 'gear,' *at least until it has been affixed.*" (Emphasis added.)

Plaintiff apparently has seized upon this language and has attempted to show the requisite connections. He points to a "save-all" net which was connected on one side to the ship's railing, and on the other side to the outboard edge of the skid. He also points to the use of a "house-fall" (a wood block attached to the face of the pier above the skid) as establishing a connection between the ship and the pier (including the skid).

■■ ■■ While the presence of the "save-all" net and the "house-fall" is uncontroverted, we hold that they were not sufficient to transform the skid into an appliance or appurtenance of the SS. BEERSHEVA. See Penoro v. Rederi A/B Disa, 64 Ad. 478 (1967). The skid was obviously a permanent and integral part of the pier, and the mere fact that it was removable does not distinguish this case from *Fredericks* or *Penoro.* The court is of the opinion that the dictum in *Forkin,* supra, and the holding in Di Salvo v. Cunard Steamship Co., 171 F.Supp. 813 (S.D.N.Y., 1959), are not apposite here because the character of the equipment involved in those cases differed materially from that used here. The portable conveyor belt in *Forkin* and the passenger baggage chute in *Di Salvo,* when attached to a ship, are more intimately connected with the ship than

is a skid and are regularly used in the industry literally to connect ships and docks for unloading purposes. The court is aware that in other Circuits the duty of seaworthiness has been liberally extended to include various equipment used in the unloading procedure. See Spann v. Lauritzen, 344 F.2d 204 (3d Cir., 1965); Huff v. Matson Navigation Co., 338 F.2d 205 (9th Cir., 1964). In this Circuit, at least in relation to the skid in question, the *Fredericks* case still controls. The holding made with relation to the skid applies as well to the alleged unseaworthiness of the steel "shoe" of the skid and the manila rope which bound the inboard corners of the skid to the pier.

■■ Plaintiff further contends that Zim Israel breached its warranty of seaworthiness, since the cargo slings were not reasonably fit for their intended use. Although these slings were owned and maintained by McGrath, the warranty of seaworthiness has been extended to cover equipment brought aboard the vessel by the stevedore. Alaska Steamship Co. v. Petterson, 346 U.S. 914, 74 S.Ct. 272, 98 L.Ed. 410 (1954); Rogers v. United States Lines, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120 (1954). Plaintiff alleges that the cargo slings were unseaworthy because of the swaged fittings on the end of the sling which formed the loop referred to previously. This metal swaging presented an edge which was raised approximately ¼″ away from the surface of the steel cable of the sling. This court is not persuaded that this raised edge rendered the sling unseaworthy. A demonstration conducted in court showed that, even when this edge did catch onto an opposing surface, only a slight pressure was required to pull it free. The court finds that this ¼″ edge did not dislodge the skid in question, which weighed in excess of one ton. Further, there was adequate expert testimony to the effect that a spliced collar which was the only alternative to the swaged collar mentioned, had as many potential dangers as the swaged collar, if not more.

■ However, although the cargo sling involved in the accident was not rendered unseaworthy on structural grounds, the negligent use of the sling by McGrath's employees did render it unseaworthy. It is now clear in the Second Circuit that a ship is rendered unseaworthy when longshoremen make negligent use of seaworthy equipment. Candiano v. Moore-McCormack Lines, Inc., 382 F.2d 961, rehearing den. 386 F.2d 444 (2d Cir., 1967), cert. den. 390 U.S. 1027, 88 S.Ct. 1416, 20 L.Ed.2d 284; Alexander v. Bethlehem Steel Corp., 382 F.2d 963 (2d Cir., 1967). These two cases represent this Circuit's interpretation of the Supreme Court's per curiam opinion in Mascuilli v. United States, 387 U.S. 237, 87 S.Ct. 1705, 18 L.Ed.2d 743 (1967). In *Candiano*, supra, Judge Moore, in his opinion, stated (386 F.2d at 448):

"Negligence would appear to create unseaworthiness from the very moment of the act. The words "reasonably fit" and "reasonably suitable" lose all significance if the happening of the accident in and of itself is regarded as an adequate demonstration that the ship was not in such condition.

"* * * Even though operational negligence created the unseaworthiness, it is difficult to find any place for such a doctrine as a defense against liability, if the very finding of operational negligence is a simultaneous finding of unseaworthiness. The alchemy is instantaneous."

In *Alexander*, supra, the companion case to *Candiano*, Judge Moore further stated (382 F.2d at 965):

"A charge distinguishing between operational negligence and unseaworthiness would appear to have been error."

The reference to operational negligence notes the old distinction in this Circuit as laid down by Grillea v. United States, 232 F.2d 919 (2d Cir., 1956). That case held that the negligent acts of a stevedore could transform a formerly seaworthy vessel into an unseaworthy one, provided the negligent act had come

to rest under the former theory. The passage of time thus was a crucial element in the transformation process. See Radovich v. Cunard Steamship Co., Ltd., 364 F.2d 149, 151–152 (2d Cir., 1966); Norfleet v. Isthmian Lines, Inc., 355 F.2d 359, 363–364 (2d Cir., 1966). It is now well settled, however, that the *Grillea* reliance upon the passage of time is no longer the law in this Circuit. Cleary v. United States Lines Co., 287 F.Supp. 601 (S.D.N.Y., 1967); La Capria v. Compagnie Maritime Belge, 286 F.Supp. 980 (S.D.N.Y., 1968).

 Plaintiff has proven unseaworthiness in the improper manner in which the cargo slings were handled by McGrath's employees. Plaintiff alleges that both Morin and the winch operators were negligent. The court is convinced that at least one of these allegations is a correct one. Morin may have negligently dropped the sling to the floor of the skid before the winchman properly took up the slack; or the winchman may have prematurely taken up the slack forcing Morin to release the sling; or both may have occurred, but certainly one or both were the cause of the accident. Since Morin and the winchman were both longshoremen, and employees of McGrath, there is no need to choose between them. It is clear that if neither Morin nor the winchman acted negligently, this accident would not have occurred. The court finds that these negligent acts, rendering the cargo slings to be unseaworthy, were the proximate cause of the accident.

 The court finds that plaintiff's allegations of negligence on the part of Zim Israel must fail. The negligent handling of the cargo slings was part of the unloading process, and the shipowner is not required closely to oversee the stevedore as to such activities. As the Court of Appeals for the Second Circuit stated in Pisano v. SS. Benny Skou, 346 F.2d 993, 995 (1965):

"At most a general inspection of conditions on board rather than minute, continuous supervision of every detail entrusted to a responsible stevedoring firm was all that was needed to satisfy the duty of reasonable care under the circumstances."

 The court further finds that the plaintiff was not guilty of contributory negligence. The evidence establishes that plaintiff detached his cargo sling in a manner which accorded with acceptable practice. Expert testimony elicited at the trial confirmed this, although there was some question as to whether this method is the preferred one. Even if the method employed was in fact unsafe, it is general practice to proceed in this manner, and thus plaintiff's recovery should not be reduced. Adams v. United States, 393 F.2d 903 (9th Cir., 1968). Nor was plaintiff under any obligation to protest his fellow employee Morin's actions or to refrain from working until new procedures were instituted. Ballwanz v. Isthmian Lines, Inc., 319 F.2d 457, 462 (4th Cir., 1963). No action or omission of the plaintiff contributed to his accident.

## II.

After the plaintiff was thrown from the skid to the stringpiece, he was removed in a semi-comatose state to the Beekman Downtown Hospital. His injuries were diagnosed as a fracture of the anterior portions of both nasal bones, depression and probable fracture of the anterior nasal species of maxillary bone, comminuted fracture of the medial and lateral malleolus with lateral subluxation of the tibia. Plaintiff remained in the hospital for approximately three weeks, and his leg was set in a cast in accordance with accepted surgical procedure.

Following the accident, plaintiff remained out of work for a ten-month period, during which time he consulted various physicians. The examining physicians found that plaintiff suffered defects in both flexion and extension of the left ankle, and that the movements of inversion and eversion had been lost completely. In an examination some two weeks before trial, it was found that

plaintiff's powers of flexion and extension of the left ankle were now normal, inversion was only slightly improved. and eversion was still totally absent.

Plaintiff has testified that since the accident he has difficulty breathing through the nose, suffers from occasional headaches, and that his left ankle causes him intermittent pain of varying degrees. Such pain is entirely consistent with the findings of Dr. Harry Sherman, an orthopedic surgeon who testified at the trial that the plaintiff now has a traumatic arthritis of his left ankle joint, that is, a rough, bony overgrowth of the joint surfaces. It was Dr. Sherman's opinion that this traumatic arthritis will only worsen with time.

■ Plaintiff's age is between 33 and 34 years, and, according to the United States Life Tables and Table of Working Life, he has a future life expectancy of 36.3 years and a future work expectancy of 30.9 years. Although it is certain that plaintiff's injuries are permanent, he has not demonstrated that his earnings during the next 30.9 years of expected employment will be diminished by his incapacity. A comparison of the quarterly average of hours worked by plaintiff before and after the accident does not bear out the contention that future earnings will be diminished as a result of the injuries suffered. The respective quarterly averages of hours worked are 528 in 1962, 471 in 1963, 526 in 1966, and 508 in 1967. Based on first half figures, the projected quarterly average for 1968 is 530 hours. Plaintiff has thus not met his burden of proof on loss of future earnings.

■ The court does find, however, that lost wages for the last quarter of 1964 and for the full year of 1965 amount to $8,204.00. The medical expense incurred by plaintiff and stipulated by counsel is $1,369.25.

The plaintiff has suffered varying degrees of pain in the past, and the medical testimony confirms that he will continue to suffer in the future and that his arthritic condition is likely to deteriorate with consequent increasing discomfort, or immobility, or both. The court is of the opinion that $12,500 is a just compensation for past pain and suffering. The court finds that, as a result of his injuries, (1) plaintiff's mobility has been noticeably limited; (2) plaintiff's arthritic condition is real and substantial and will cause significant future pain and suffering; and (3) the amount of $5.00 per day constitutes fair and reasonable compensation for such immobility and future pain and suffering. Based on plaintiff's future life expectancy of 36.3 years, this amounts to $66,250.00.

Accordingly, plaintiff is entitled to a judgment of $88,323.25.

The foregoing shall constitute this court's Findings of Fact and Conclusions of Law as required by Rule 52, F. R.Civ.P.

Submit proposed judgment on notice.