Alejandro SANDOVAL

v.

VICTORY CARRIERS, INC.

Civ. A. No. 70-2616.

United States District Court,
E. D. Pennsylvania.

Feb. 12, 1973.

Freedman, Borowsky & Lorry, Avram G. Adler (Freedman, Borowsky & Lorry), Philadelphia, Pa., for plaintiff.

James F. McMullan, Jr., Philadelphia, Pa., for defendant.

## MEMORANDUM OPINION

BECHTLE, District Judge.

A ten- to twelve-foot long, four- by four-inch piece of lumber separated and fell from a load of similar pieces being hoisted aboard the SS *Sagamore Hill* by her lifting apparatus, injuring a longshoreman while he was on a pier engaged in the process of loading lumber onto the ship under the direction of his employer, the stevedore. Invoking both the admiralty [1] and di-

---

1. Section 1333, Title 28, U.S.C., implementing Article III, § 2, Cl. 1 of the United States Constitution, provides that the district courts shall "have original jurisdiction, exclusive of the courts of the States, of . . . [a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." The Admiralty Extension Act of 1948 provides that "[t]he admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land." 62 Stat. 496, 46 U.S.C. § 740. If admiralty jurisdiction was present in Gutierrez v. Waterman Steamship Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963), where the Extension Act was applied without question to allow recovery of damages by "a longshoreman injured on a dock by defective cargo containers being unloaded from a ship located on navigable waters." (Victory Carriers, Inc. v. Law, 404 U.S. 202, 210, 92 S.Ct. 418, 424, 30 L.Ed.2d 383 (1971)), it is present in the instant case. In *Gutierrez*, the longshoreman slipped on loose beans spilled and scattered on the surface of a pier from defective cargo containers belonging to the ship.

Whatever effect the case of Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), may have had on the rule applied in the Victory Carriers, Inc. v. Law case, it did not diminish the admiralty jurisdiction in the case before me, even though the relationship of the wrong to traditional maritime activity test were to be used instead of the Extension Act.

versity[2] jurisdiction of this Court, the injured longshoreman brought an action for damage against the owner and operator of the ship, claiming unseaworthiness of the vessel and negligence of its owner and operator. The defendant did not join the stevedoring company as a third-party defendant.

The matter is before me on defendant's motion for summary judgment on the ground that the undisputed facts, as gleaned from the pleadings and depositions, show that the action of the stevedore did not render the vessel unseaworthy and that the defendant was not negligent. The pretrial depositions of both the plaintiff[3] and Edward A. Snow, the chief officer of the vessel on duty at the time plaintiff was injured, have been taken; they have been filed of record in this action.

On July 21, 1969, plaintiff was employed as a longshoreman by the Panama Agencies Company, a Panamanian company which performed the stevedoring work in connection with a loading operation involving the SS *Sagamore Hill*. The vessel was owned and operated by defendant and was then moored to Pier 16 in Balboa, Panama Canal Zone.[4] Plaintiff was ordered by his stevedore foreman to mount a flatbed truck carrying two piles of ten- to twelve-foot long, four- by four-inch pieces of lumber. The piles were each two and a half to three feet high, weighed over 500 pounds, and placed in a double-file position on the flatbed with the end of one overlapping that of the other. The lumber was to be used to keep heavy cargo in the No. 5 hold from shifting during the voyage. The truck was stationed five to six feet from the edge of the pier opposite the No. 5 hold. Plaintiff's foreman was standing near the flatbed truck and was acting as a signalman for the winch operator; the chief officer of the ship watched the operation from the cabin deck on the starboard side. At about 1:00 p. m., after two wire slings attached to a fall were lowered within reach of the longshoreman on the truck,[5] plaintiff placed one of them around an end of a lumber pile and then attached the wire loop to the hook of the fall hanging directly overhead from the boom, while his fellow worker performed a similar task on the other end. Then the foreman signaled the winchman, also an employee of the stevedore, to raise the pile of lumber. The load was lifted too quickly and, before plaintiff and his co-worker had time to gently push it aside so that it would have clearance, it came into contact with the second and swayed at approximately a 30° angle as it rose. When it was about eight feet above the flatbed, one of the pieces became dislodged and fell. Before plaintiff could get free, the piece struck him on the back, knocking him to the floor of the pier. The remaining pieces also slipped from the slings and fell to the pier.

The defendant contends that these facts, taken in the light most favorable to plaintiff, demonstrate that the sole cause of plaintiff's injury was the neg-

---

2. Under the saving to suitors clause of 28 U.S.C. § 1333, *supra*, the plaintiff is entitled to assert his claim under the diversity jurisdiction of the district courts, 28 U.S.C. § 1332(a)(2), as well as under § 1333 itself. Victory Carriers, Inc. v. Law, 404 U.S. 202, 204, 92 S.Ct. 418, 420, 30 L.Ed.2d 383 (1971). However, under either section the claim of unseaworthiness, being rooted in maritime law, the district court will apply that law even if the law of the Canal Zone were different from the maritime law. *Id.*

3. Plaintiff was at a communications disadvantage during his deposition, as a Spanish interpreter was not present.

4. Under the Vessels in Territorial Waters Act, the term "United States" includes the Canal Zone and all territory and waters, continental or insular, subject to the jurisdiction of the United States. Act of June 15, 1917, C. 30, Title XIII, § 1, 40 Stat. 231, 50 U.S.C. § 195.

5. Compare the facts concerning a sling in Tarabocchia v. Zim Israel Navigation Co., 297 F.Supp. 378, 382 (S.D.N.Y., 1969), with those in our case.

ligence of the winch operator in operating the winch too fast; therefore, under the decision of Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971), he is not entitled to rely upon any warranty of seaworthiness. There, the job of the longshoremen, under the direction of their stevedore-employer, was to secure bundles of cargo to a sling attached to a ship's fall each time it was lowered within their reach on a barge alongside the ship. On one occasion, after the loading operations had been proceeding in that manner for some time, the sling was lowered, but beyond their reach. After Joseph Charles Usner, one of the longshoremen on the barge, motioned to the signalman to direct the winch operator to lower the fall farther, the latter did so "but he [the winch operator] lowered it too far and too fast. The sling struck [Usner], knocking him to the deck of the barge and causing his injuries." *Id.*, at 495, 91 S.Ct., at 515, 27 L.Ed.2d 562. Usner sought recovery from the ship owner and charterer on the theory that the operating negligence of the winch operator on this single occasion rendered the ship unseaworthy. The district court denied the motion of the ship owner and charterer for summary judgment. The Supreme Court, in affirming an order of the Court of Appeals directing that the motion be granted, ruled that an isolated, personal negligent act of a longshoreman (there, the winch operator) will not render the ship unseaworthy. In doing so, the Court observed that unseaworthiness is a condition and that "A vessel's condition of unseaworthiness might arise from any number of circumstances. Her gear might be defective, her appurtenances in disrepair, her crew unfit. The number of men assigned to perform a shipboard task might be insufficient. The method of loading her cargo, or the manner of its stowage, might be improper. For any of these reasons, or others, a vessel might not be reasonably fit for her intended service." (Footnotes 13

to 17 inclusive omitted.) 400 U.S. at 494–499, 91 S.Ct., at 517–518, 27 L.Ed.2d 562.

In the case before us, when the vessel's chief officer was cross-examined at his pretrial deposition hearing, he admitted that if proper strap slings of equal length which will tighen around a draft had been used on the pile of lumber in question it would have been practically impossible for any of the pieces of lumber to separate from it. (Snow Deposition, pp. 14, 29–31.) The Court noted in *Usner* that a vessel's condition of unseaworthiness might arise from the method of loading her cargo. Also see Thompson v. Calmar SS Corp., 331 F.2d 657, 661 (CA3, 1964); Ferrante v. Swedish American Lines, 331 F.2d 571 (CA3, 1964); Hagans v. Farrell Lines, Inc., 237 F.2d 477 (CA3, 1956).

In our case, the load was lifted too fast for one of two reasons: (1) The winch operator improperly operated the levers of the winch; or, (2) the winch was defective. The winch operator has not been deposed concerning his or the winch's operation on that particular occasion. Neither side has indicated whether they intend to question him or whether he is unavailable for that purpose. In the absence of his testimony, I think a reasonable inference may be drawn from the record that the winch was defective. Snow testified at his deposition that the cargo gears of the ship were formally inspected on July 13, 1969, eight days before the accident, and found to be in good shape. However, he also stated in answer to questions that, approximately five days before the accident, the ship had been at the Rodman Naval Station, Canal Zone, taking on cargo, such as "heavy pieces of cargo, and quite a number of motor vehicles, heavy tank trailers, heavy trucks, tanks, Army tanks, boat-building equipment and equipment of that nature, which it was necessary to block and to use chain lashing and cable lashing so in the event of a heavy sea this cargo wouldn't wash overboard or go adrift." (Snow Deposi-

**1000**

tion, p. 6.) He also stated that the winches were exposed to the weather and that the last time the twin electrical winches at the No. 5 hatch had been used to lift cargo was four to five days before the accident; and if the winches malfunction, the longshoremen report it to the electrician on the vessel, who is not asked to check them each morning before the longeshoremen start operation, but waits until a complaint is made. "If the winches have been working satisfactorily we assume there is no reason why the next morning they shouldn't continue to work satisfactorily." (Snow Deposition, p. 27.) The plaintiff also stated in his deposition that the longshoremen worked steadily that day from 7:00 a. m. without taking time out for lunch, indicating there was some urgency in loading the ship that day.

Negligence on the part of the defendant is not a foregone conclusion at this juncture, but neither may I conclude that it was not negligent as a matter of law. Regarding the obligation of a vessel to a longshoreman, the Court of Appeals in the *Ferrante* case, *supra,* CA3, 331 F.2d at 575, said: "Where a ship knows, or should have known, that the stevedore's method of [loading] its cargo does not conform to the standard of reasonable care, and thereby creates a hazardous condition, the ship is negligent when it does not forbid the use of the method." (Footnote 7 omitted.) Although the chief officer of the ship admitted that he was observing the loading operation, he testified that he could not remember the type of slings the longshoremen were using on that particular occasion. (Snow Deposition, p. 29.) Of course, Snow's credibility is for the jury to decide; but even if we assume that they will believe him, a question would still remain, which is factual and in dispute, whether the ship should have known that the stevedore's method of loading the lumber aboard the ship conformed to the standard of reasonable care.

The motion for summary judgment will be denied.